[No. S025858. Apr. 5, 1993.]

GERALD S. RUBIN, Plaintiff and Appellant, v.
NORMA GREEN et al., Defendants and Respondents.

## COUNSEL

Grebow & Barish, Arthur Grebow, Patricia A. Brown, Lincoln Stone and Susan Gruskin for Plaintiff and Appellant.

David Spangenberg, Hart, King & Coldren, Robert S. Coldren, John H. Pentecost, Lawrence R. Bujold, Rubenstein & Bohachek, Earl L. Bohachek, Daniel J. Popeo and Richard A. Samp as Amici Curiae on behalf of Plaintiff and Appellant.

Musick, Peeler & Garrett, Harry W.R. Chamberlain II, Birgit Sale, Mary Catherine M. Bohen, Matthew P. Stone and Joseph D. Rubin for Defendants and Respondent.

Richard N. Bates, Robert C. Fellmeth, Crosby & Stanton, Bruce E. Stanton, Altshuler, Berzon, Nussbaum, Berzon & Rubin, and Fred H. Altshuler as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**ARABIAN, J.**—At common law, barratry was "the offense of frequently exciting and stirring up suits and quarrels" (4 Blackstone, Commentaries 134) and was punished as a misdemeanor. A statutory version of the crime survives today, although it is seldom prosecuted, perhaps because of the requirement that the proof show the defendant "excited" at least three groundless suits "with a corrupt or malicious intent to vex and annoy." (Pen. Code, §§ 158, 159.)

The modern successor of common law barratry, solicitation, is not only a misdemeanor when accomplished through the use of agents, but is also subject to discipline by the State Bar. We granted review in this case to consider whether a defendant in an impending civil action may sue the attorneys for the opposing party on the ground that they wrongfully "solicited" the litigation against him. We conclude that this proceeding not only undermines the established policy of allowing access to the courts, but that,

given the availability of other remedies for the redress of attorney solicitation, this retaliatory suit is not maintainable.

I

The present action grows out of a "notice of intention to commence action" mailed on August 28, 1989, to Gerald Rubin by Norma Green. The notice was purportedly on behalf of all of the approximately 450 San Bernardino County residents of Cedar Village Mobilehome Park, a park co-owned by Rubin. In her notice, Green, herself a Cedar Village resident, enumerated 23 alleged defects in the operation of the park and sought a variety of remedies under California and federal law.

Rubin's attorney replied on his behalf to Green's letter, offering to meet with a park residents group to discuss the grievances and "attempt to reach a mutually satisfactory resolution." The reply went on to assert that Green had "made threatening statements to various residents" of Cedar Village "in the process of soliciting clients" as an agent for her attorneys' law firm. It concluded by warning Green that Rubin would "not tolerate such conduct and will seek appropriate compensation in the event of any loss or injury to Mr. Rubin's contractual and business relationship with his tenants and employees." Green's attorneys responded to Rubin's letter, contesting many of its assertions but indicating a desire to discuss a resolution of their clients' grievances.

Approximately a week after receiving the law firm's response, Rubin filed this action in the superior court against both Green and the law firm. Rubin's verified complaint alleged several tort claims, the gist of which was that the defendants had solicited Cedar Village residents as clients in anticipated litigation against Rubin over park conditions, thereby interfering in Rubin's contractual relations with them.

The complaint alleged that, with Green as their agent, the law firm had "embarked on a malicious effort to harm [Rubin's] economic and business standing by stirring up animosity among [Cedar Village] residents, utilizing fear, intimidation and coercion against residents, and communicating the false promise of frivolous litigation as a means to profit unjustly at [Rubin's] expense." The complaint sought damages as well as equitable relief enjoining defendants from soliciting "non-client residents at Cedar Village . . . to become legal clients of [the law firm] on any matter concerning Cedar Village . . . ." Meanwhile, on December 7, 1989, Green and over 120 other residents of Cedar Village, represented by the defendant law firm, filed the action noticed in Green's letter of August 28 to Rubin, alleging a failure to

adequately maintain the park and the imposition of illegal restraints on the sale of mobilehomes by the park owners.[1]

After the superior court denied his application for interim equitable relief and refused a request that the failure-to-maintain suit be consolidated with this action, Rubin filed an amended complaint, adding a claim against defendants for "unfair business practices" and narrowing the request for injunctive relief to encompass only acts of alleged harassment against him. The amended complaint also offered a more detailed account of the solicitation allegedly practiced by the defendants on the residents of Cedar Village.

According to the amended complaint, the law firm had engaged in a pattern of soliciting residents of several mobilehome parks for the purpose of commencing litigation against park owners. Allegedly, the firm's modus operandi was to arrange for an invitation to meet with park residents to help negotiate a resolution of complaints regarding park conditions with the owner; this, in turn, would lead to a promise by the firm to obtain substantial monetary settlements for those residents who agreed to join in litigation against the owner. A lawsuit, preceded by a "form" notice of suit, followed. After filing suit, often on behalf of a hundred or more mobilehome park residents, the law firm would seek an early trial preference on the basis of the advanced age of some of the resident-plaintiffs, thereby (according to the amended complaint) truncating the defendant owner's opportunity for full discovery.

The superior court sustained a general demurrer to the first amended complaint without leave to amend on the ground that defendants' conduct was privileged under Civil Code section 47, subdivision (b) (section 47(b)), the so-called "litigation privilege." A divided Court of Appeal reversed that judgment, ruling that the privilege did not apply to the acts of the law firm and Green for alternative reasons.

First, a majority of the Court of Appeal concluded that although the acts of defendants leading to the law firm's retention by the Cedar Village

---

[1]Relations between park and mobilehome owners are extensively regulated by statute. The Mobilehome Residency Law (Civ. Code, § 798 et seq.) requires a written rental agreement and specifies its contents, regulates rents and related charges that park owners may impose on residents, provides for meetings between residents and park management, regulates the termination of tenancies and the transfer of mobilehomes and mobilehome parks, and provides judicial remedies and penalties. The latter provision includes a requirement that before an action for the alleged failure to maintain common park facilities or levels of service—a so-called "failure-to-maintain" suit—is instituted by park residents, 30 days written notice of the intention to file such an action must be given management. (Civ. Code, § 798.84.) It was this 30-day "suit letter" from Green to the plaintiff that precipitated the present proceeding.

residents were necessarily "communicative," that aspect of their conduct was secondary. The dominant characteristic of defendants' actions was noncommunicative, and thus was not entitled to the protection of section 47(b). Alternatively, the majority concluded that the Legislature had established an exception to the litigation privilege when it enacted a statutory prohibition on attorney solicitation. That prohibition, embodied in Business and Professions Code sections 6152 and 6153, makes it unlawful to act as an agent in the solicitation of business on behalf of attorneys, punishing violations as a misdemeanor. Finally, the Court of Appeal held that defendants' conduct in allegedly soliciting Cedar Village residents as clients constituted unfair competition, for the redress of which the Unfair Business Practices Act (Bus. & Prof. Code, § 17200 et seq.) provided plaintiff with a private right of action for damages and injunctive relief.

One justice dissented, reasoning that the litigation privilege of section 47(b) applied to the conduct in suit, that the acts of the law firm and Green, alleged in the amended complaint, amounted to inducing the Cedar Village residents to file a lawsuit and were thus protected by a separate immunity, and that the unfair competition statute did not confer a cause of action on plaintiff against defendants for solicitation. We agree with the dissenting justice, albeit for somewhat different reasons, that plaintiff's suit cannot be maintained.

As we explain, the acts of defendants alleged in the amended complaint were communicative within the meaning of section 47(b). They were thus within the scope of the privilege and immune from tort liability. We also conclude that because plaintiff's wrongful solicitation claim lacks an essential attribute of a malicious prosecution action and is brought against attorneys representing litigation adversaries in a related proceeding, it is not maintainable in any event. Finally, we hold that plaintiff may not avoid the bar of section 47(b) by pleading his claim as one for injunctive relief under the unfair competition statute. We will accordingly direct that this action be dismissed.

## II

For well over a century, communications with "some relation" to judicial proceedings have been absolutely immune from tort liability by the privilege codified as section 47(b).[2] At least since then-Justice Traynor's opinion in *Albertson* v. *Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405], California courts

---

[2]As pertinent here, Civil Code section 47 provides: "A privileged publication or broadcast is one made:

" . . . . . . . . . . . . . . . . . . . . . . .

"(b) In any . . . (2) judicial proceeding . . . ."

have given the privilege an expansive reach.[3] ■ Indeed, as we recently noted, "the only exception to [the] application of section 47(2) [now section 47(b)] to tort suits has been for malicious prosecution actions. [Citations]." (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 216 (*Silberg*).)

(2) Undergirding the immunity conferred by section 47(b) is the broadly applicable policy of assuring litigants "the utmost freedom of access to the courts to secure and defend their rights . . . ." (*Albertson* v. *Raboff, supra,* 46 Cal.2d at p. 380.) We have recently reemphasized the importance of virtually unhindered access to the courts in several opinions. In *Silberg, supra,* 50 Cal.3d 205, we said that the "principal purpose of section 47([b]) is to afford litigants . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Id.* at p. 213.) And, in *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157 [232 Cal.Rptr. 567, 728 P.2d 1202], we declined to permit the expansion of the abuse of process tort to include the alleged improper filing of a lawsuit; to do so, we reasoned, would remove existing barriers to the maintenance of malicious prosecution actions, requirements that we said "play[ ] a crucial rule in protecting the right to . . . judicial relief . . . ." (*Id.* at p. 1170.) In *Bear Stearns, supra,* 50 Cal.3d 1118, we called the requirement of probable cause in malicious prosecution actions "essential to assure free access to the courts . . . ." (*Id.* at p. 1131.) (See also *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 872 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*) [malicious prosecution tort "carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court . . . ."].)

■ In light of this extensive history, it is late in the day to contend that communications with "some relation" to an *anticipated* lawsuit are not within the privilege. Following *Albertson* v. *Raboff, supra,* 46 Cal.2d 375, numerous decisions have applied the privilege to prelitigation communications, leaving no doubt as to its applicability to the facts alleged in the amended complaint. (See, e.g., *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 393 [182 Cal.Rptr. 438] [privilege applies to communications with "some relation to a proceeding that is actually contemplated in good faith and under serious consideration by . . . a possible party

---

[3](See, e.g., *Drasin* v. *Jacoby & Myers* (1984) 150 Cal.App.3d 481, 485 [197 Cal.Rptr. 768] [abuse of process]; *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] [invasion of privacy and intentional infliction of emotional distress]; *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 487 [104 Cal.Rptr. 650] [negligence and negligent misrepresentation]; *Carden* v. *Getzoff* (1987) 190 Cal.App.3d 907 [235 Cal.Rptr. 698] [fraud]; *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587] (*Bear Stearns*) [interference with contract claims]; see also *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 215 [266 Cal.Rptr. 638, 786 P.2d 365].)

to the proceeding"]; *Rosenthal* v. *Irell & Manella* (1982) 135 Cal.App.3d 121, 126 [185 Cal.Rptr. 92] ["potential court actions"]; *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 865 [100 Cal.Rptr. 656] [privilege extends to "preliminary conversations and interviews" related to contemplated action]; *Pettitt* v. *Levy, supra,* 28 Cal.App.3d 484, 490 [meeting of parties and counsel to "marshal their evidence for presentation at the hearing"]; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 577 [131 Cal.Rptr. 592] [privilege extends to "steps taken prior" to judicial proceedings].) In short, we can imagine few communicative acts more clearly within the scope of the privilege than those alleged in the amended complaint, that is, meeting and discussing with Cedar Village residents park conditions and the merits of the proposed failure-to-maintain lawsuit, and filing the complaint and subsequent pleadings in the litigation.

Nor does the fact that defendants' communications with the Cedar Village residents necessarily involved related acts destroy the privilege. In concluding that the gravamen of the amended complaint involved noncommunicative conduct, the Court of Appeal relied on our opinion in *Kimmel* v. *Goland* (1990) 51 Cal.3d 202 [271 Cal.Rptr. 191, 793 P.2d 524]. In *Kimmel,* we held that the litigation privilege of section 47(b) was inapplicable to the unconsented recording by plaintiffs (and subsequent transcription by their attorney) of telephone conversations with defendants, an offense under Penal Code section 632. We noted that defendants alleged that they were injured "from the *taping* of confidential telephone conversations, not from any 'publication' . . . of the information contained in these conversations." (*Id.* at p. 209, italics added.)

To further emphasize the distinction between communicative acts and noncommunicative conduct—"traditionally . . . a threshold issue in determining the applicability of section 47[b]" (*Kimmel* v. *Goland, supra,* 51 Cal.3d at p. 211)—we relied on our decision in *Ribas* v. *Clark, supra,* 38 Cal.3d 355, in which the plaintiff also sought damages for eavesdropping. There, we also upheld the recovery of statutory penalties for violations of Penal Code section 632, noting that the right to such penalties accrued "at the moment of the violation [and] is not barred by the judicial privilege." (38 Cal.3d at p. 365.) However, we applied the privilege of section 47(b) to bar plaintiff's tort claims for damages resulting from the *testimonial* use of the contents of the overhead conversation, finding "the purpose of the . . . [litigation] privilege . . . no less relevant" to plaintiff's claim. (38 Cal.3d at p. 364.)

In *Kimmel* v. *Goland, supra,* 51 Cal.3d 202, we also said that "our holding that the litigation privilege does not apply is limited to the injury resulting

from plaintiffs' and [their attorney's] *conduct.* To the extent the complaint rests on [the attorney's] alleged communicative acts of 'counseling' and 'advising' his clients, the privilege is clearly operative." (*Id.* at p. 208, fn. 6, italics added.) Judging from the allegations of the amended complaint, plaintiff's claims, however styled, are founded essentially upon alleged misrepresentations made by the law firm (and Green) to Cedar Village residents in the course of discussions over park conditions and the possibility of being retained to prosecute the failure-to-maintain action, and the subsequent filing of pleadings in the lawsuit itself. Whether these acts amounted to wrongful attorney solicitation or not, they were communicative in their essential nature and therefore within the privilege of section 47(b).

### III

Having concluded that the acts at issue here are within the scope of section 47(b), and are thus protected from tort liability, we must determine the extent of that protection. As we explain, because plaintiff's claim of attorney solicitation lacks an essential feature of other derivative tort actions, restrictions affecting the maintenance of such actions—limitations on the timing of such claims and the elements of the alleged wrong that must be established—are inapplicable. Instead, given the gravamen of the amended complaint, we are led to conclude that plaintiff's claim is not maintainable at all.

The core policy protecting access to the courts underlying section 47(b) has led to the requirement that a derivative tort action seeking redress for communications within the privilege be delayed until the original suit is terminated in favor of the derivative plaintiff. Its maintenance is further conditioned on a heightened showing of abuse, amounting in effect to a species of bad faith, by the plaintiff in the initial suit. The filing of retaliatory claims has thus been limited by incorporating conditions borrowed from the venerable common law tort of malicious prosecution. (See, for example, *Silberg, supra,* 50 Cal.3d at p. 216; *Bear Stearns, supra,* 50 Cal.3d at p. 1137.) Circumscribed retaliatory actions are thus permitted as a means of redressing a wrong—groundless litigation—that has, partly but not entirely, already been established by the outcome in the original proceeding.

Here, however, the gravamen of plaintiff's complaint is not that the claims of the Cedar Village litigants are themselves groundless, but that the methods employed by the law firm (through the use of Green) in being retained as counsel for the residents amounted to solicitation, conduct the Legislature has made criminal. Because the alleged wrong which plaintiff seeks to redress is not the filing of an unjustified lawsuit but of *soliciting*

others to file what are, to all appearances, potentially *meritorious* claims, the question is not whether the solicitation claim should be subject to conditions analogous to those governing malicious prosecution actions, but whether such a derivative claim should be maintainable at all.[4] A consideration of the administrative and criminal sanctions established by the Legislature for attorney solicitation, together with the remedies available to plaintiff within the scope of the failure-to-maintain suit itself, lead us to conclude that this action should be dismissed.

In *Sheldon Appel, supra,* 47 Cal.3d 863, the court unanimously endorsed the proposition that "in recent years . . . the large volume of litigation filed in American courts has become a matter of increasing concern . . . ." (*Id.* at p. 872.) After canvassing the arguments supporting restrictions on the use of the malicious prosecution tort as a means of controlling excessive litigation and those contra, our opinion concluded that "the most promising remedy for excessive litigation does not lie in an expansion of malicious prosecution liability." (47 Cal.3d at p. 873.)

Instead, we said that "the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded." (*Sheldon Appel, supra,* 47 Cal.3d at p. 873.) Our opinion noted that the Legislature had recently taken several steps in that direction by providing enhanced sanctions for litigation misconduct by attorneys. (*Ibid.*)

Considered from the perspective of *Sheldon Appel, supra,* 47 Cal.3d 863, and assessed in light of the cost to judicial access, we find little in the way of countervailing policies furthered by the maintenance of this derivative action. We reach that conclusion by balancing the utility of permitting a litigant in a civil action to maintain an unlawful solicitation claim against the attorneys for the opposing party against the untoward effects of such a proceeding on the administration of civil justice.

It is not difficult to imagine the consequences likely to follow in the wake of a rule permitting the defendant in a civil action to institute parallel

[4]Whether we should judicially notice the outcome of the failure-to-maintain litigation filed by the defendant law firm on behalf of Green and other Cedar Village residents is a question that is vigorously contested by the parties. In light of our conclusion that the gravamen of plaintiff's claim goes not to the merits of the failure-to-maintain litigation but to antecedent matters, we decline to judicially notice any matter related to that suit beyond the fact that it was filed.

litigation seeking to impose liability on the attorney for the adverse party based on the circumstances surrounding the formation of the attorney-client relationship that led to the filing of the original suit. Apart from provoking yet another round of litigation, all of the evils identified in our prior cases as accompanying retaliatory suits based on litigation-related communications would be promoted by such a tactic. The impairment of colorable claims by disrupting access to counsel, the intimidating effect on attorneys of facing an almost certain retaliatory proceeding, the distractions inherent in requiring counsel to deal with defending a personal countersuit as well as the predicate action and, in general, the dampening effect on the unobstructed presentation of claims which we have identified as the central value supporting limitations on other derivative tort actions, apply with equal force to this suit. (See, e.g., *Silberg, supra,* 50 Cal.3d at p. 214; *Sheldon Appel, supra,* 47 Cal.3d at p. 873; *Bear Stearns, supra,* 50 Cal.3d at p. 1131.)

On the other hand, given the regulatory and prosecutorial sanctions available to remedy attorney solicitation, together with those available to litigants within the scope of the predicate action itself, the utility of a proceeding such as this one is marginal. As noted, attorney solicitation through the use of "runners" or "cappers" is a crime, punishable as a misdemeanor. (Bus. & Prof. Code, §§ 6152-6153;[5] see, e.g., *Hutchins* v. *Municipal Court* (1976) 61 Cal.App.3d 77 [132 Cal.Rptr. 158].) Attorneys who engage in solicitation also are subject to discipline by the State Bar. Rule 1-400 of the Rules of Professional Conduct of the State Bar imposes substantial limitations on the content and timing of communications by or on behalf of attorneys concerning availability for professional employment and explicitly prohibits solicitation that is not constitutionally protected. (See rule 1-400(C), Rules Prof. Conduct of State Bar.) Under its rulemaking power, the State Bar has adopted specific standards for communications that presumptively violate the proscription on attorney solicitation. (See Drafter's Note, Deering's Ann. Rules of Court (1993 pocket supp.) Rules Prof. Conduct of State Bar, foll. rule 1-400; stds. adopted May 27, 1989.) In addition, the State Bar is charged by statute with the enforcement of the anti-solicitation statute and empowered to seek injunctive relief. (Bus. & Prof. Code, § 6030.)

Plaintiff and supporting amici curiae assert that these remedies are insufficient. They argue that the growing litigiousness of society has been fueled by the uncontrolled growth of attorney solicitation, and that the practice is malum in se, an evil that, although it may lead to the filing of meritorious

---

[5]The Legislature recently amended the attorney solicitation statute (Bus. & Prof. Code, § 6153) to increase the penalty for a first offense from six months to one year in the county jail and to permit a sentence of state imprisonment for a second offense for between sixteen months and three years, together with a $10,000 fine. (Stats. 1991, ch. 116, § 7.)

claims, ought to be vigorously discouraged by the courts. They assert that existing sanctions against solicitation are as a practical matter illusory—so seldom enforced that they have no real deterrent effect. The only effective solution is to permit the indirect "victim" of the solicitation—the defendant in a prospective or pending lawsuit—to police the line between wrongful solicitation and activities short of that offense by maintaining suits such as this one.

We are unpersuaded. Attorney solicitation may indeed be perceived as a growing problem, entwined as it is with an ongoing trend toward loosening restrictions on attorney advertising and related controls on the marketing of legal services. (See, e.g., *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]; *Shapero* v. *Kentucky Bar Assn.* (1988) 486 U.S. 466 [100 L.Ed.2d 475, 108 S.Ct. 1916].) Assuming, however, for the sake of plaintiff's argument, that the rise in the volume of litigation is driven significantly by solicitation, it does not follow that we should adopt a remedy that itself encourages a spiral of lawsuits.

That, in effect, is what plaintiff seeks. A continuation of this action itself would add yet another layer of litigation. And that will not be the end of it. It is argued on behalf of plaintiff that if this action should itself fail on the merits, the law firm and Green will not be without a remedy. That remedy, according to one of the amici curiae, is nothing less than another malicious prosecution action, this one against the plaintiff by defendants. In short, the remedy urged upon us is, if anything, as bad as, or worse than, the illness it is said to cure.

We are certain, in any event, that a lawsuit such as this one is inconsistent with the choice made in *Sheldon Appel, supra,* 47 Cal.3d 863, where we specifically discounted another round of litigation as an antidote for the fevers of litigiousness, preferring instead the increased use of sanctions within the underlying lawsuit and legislative measures. Consistent with that view, litigants may invoke a range of remedies, some recently made available by the Legislature, "to facilitate the early weeding out of patently meritless claims and to permit the imposition of sanctions in the initial lawsuit . . . ." (47 Cal.3d at pp. 873-874; see, e.g., Code Civ. Proc., §§ 128.5, 437c, 1038, 409.3.) For the plaintiff in this case, potential remedies include the recovery of attorney fees and costs should he be the prevailing party in the failure-to-maintain litigation, and reasonable expenses including attorney fees if the residents are determined to have employed frivolous or delaying tactics in their suit. (Civ. Code, § 798.85; Code Civ.

Proc., § 128.5.) Ultimately, of course, plaintiff is free to prosecute a malicious prosecution action, provided the requisite conditions are pleaded and proven.[6]

## IV

■ Despite the applicability of section 47(b), plaintiff argues that he is nevertheless entitled to pursue injunctive relief because Business and Professions Code section 17204 grants any member of the public standing to seek such relief against "unfair competition." He points out that the courts have given the phrase "unfair competition" a broad meaning, embracing "any unlawful business practice . . . ." (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660], italics omitted.) Because it is made unlawful by Business and Professions Code sections 6152 and 6153, plaintiff argues, attorney solicitation qualifies as a species of unfair competition. It is thus enjoinable by "any person acting for the interests of . . . the general public." (Bus. & Prof. Code, § 17204.)

We recently traced the history and purpose behind the unfair competition statute in *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545], noting its origin as one of the so-called "little FTC Acts" of the 1930's, enacted by many states in the wake of amendments to the Federal Trade Commission Act enlarging the commission's regulatory jurisdiction to include unfair business practices that harmed, not merely the interests of business competitors, but of the general public as well. We concluded that the essence of the statutory unfair competition claim lies in its restitutionary nature. (*Id.* at pp. 1263-1264.)

(7) Although the act's coverage is indeed sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law' " (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817]), we observed that "the Legislature deliberately traded the attributes of tort law for speed and administrative simplicity. As a result, to state a claim under the act one need not plead and prove the elements of a tort. Instead, one need only show that

---

[6]Because it is not presented on this record, we do not reach the question whether, in such a subsequent malicious prosecution action, evidence of the defendants' alleged acts of solicitation would be admissible on the issues of malice and the absence of probable cause.

'members of the public are likely to be deceived.' " (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at pp. 1266-1267.)[7]

██ In evident conflict with the policy of permitting members of the public to police the spectrum of "unfair competition" is the policy embodied in section 47(b), discussed above, of insuring litigants open access to the courts. Confronted with an apparent conflict between these two statutes, we must harmonize them insofar as possible. (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 488 [204 Cal.Rptr. 897, 683 P.2d 1150].)

The closest precedent in point is our decision in *Ribas* v. *Clark, supra,* 38 Cal.3d 355. As noted, *ante,* at page 1195, there the plaintiff sought damages from a defendant who had eavesdropped on a telephone conversation between plaintiff and his former wife and subsequently testified as to the nature of their conversation; the complaint sought damages for invasion of privacy and related torts as well as damages under Penal Code section 637.2, granting persons injured by eavesdropping a right of action. Defendant contended that her testimony was privileged under section 47(b).

In upholding her claim of immunity, we expressly considered "the applicability of Civil Code section 47 to statutory causes of action." (*Ribas* v. *Clark, supra,* 38 Cal.3d at p. 364.) We reasoned that the policy of free access to the courts underlying the privilege was "equally compelling in the context of common law and statutory claims for invasion of privacy; there is no valid basis for distinguishing between the two. Certainly, nothing indicates that in enacting Penal Code section 637.2 the Legislature intended to immunize causes of action under that statute from the traditional privileges applicable to various forms of oral evidence." (38 Cal.3d at p. 365.)

In an analogous context, the Courts of Appeal have considered variations on plaintiff's claim that the unfair competition statute grants him unqualified standing to seek injunctive relief against defendants notwithstanding the absolute bar imposed by section 47(b). These decisions have rejected the claim that a plaintiff may, in effect, "plead around" absolute barriers to relief by relabeling the nature of the action as one brought under the unfair competition statute. Notably in the case of actions arising out of an insurer's alleged bad faith refusal to settle insurance claims, formerly brought under

---

[7]We went on to note in *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, that "damages are not available under [the act]. [Citations.] The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been wrongfully obtained or, in the language of the statute, an order 'restor[ing] . . . money . . . which may have been acquired by means of . . . unfair competition.' " (*Id.* at p. 1266.) This holding is dispositive of plaintiff's claim for damages here.

the Insurance Code, several decisions of the Courts of Appeal have held that the bar on such implied private causes of action, imposed by our decision in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 301 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*), may not be circumvented by recasting the action as one under Business and Professions Code section 17200.

In a typical case, *Safeco Ins. Co.* v. *Superior Court* (1990) 216 Cal.App.3d 1491 [265 Cal.Rptr. 585], the plaintiff sued an insurance carrier for its conduct in settling an automobile collision claim; he sought damages under the unfair practices provision of the Insurance Code (Ins. Code, § 790.03, subd. (h)) as well as compensatory damages, injunctive relief, attorney fees and punitive damages under Business and Professions Code section 17200. (216 Cal.App.3d at p. 1493.) The Court of Appeal ordered the complaint dismissed, holding that *Moradi-Shalal*, *supra*, 46 Cal.3d 287, barred not only the Insurance Code claims, but that "[section 17200 of] the Business and Professions Code provides no toehold for scaling the barrier of *Moradi-Shalal*. . . . To permit plaintiff to maintain this action would render *Moradi-Shalal* meaningless." (216 Cal.App.3d at p. 1494.)

The Courts of Appeal reached the same result in *Maler* v. *Superior Court* (1990) 220 Cal.App.3d 1592, 1598 [270 Cal.Rptr. 222], and *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093, 1096 [257 Cal.Rptr. 655], both of which held that implied private rights of action alleging bad faith claims against insurers, barred by our opinion in *Moradi-Shalal*, were not resurrected by casting the action as one for relief under the unfair competition statute. (See also *Lee* v. *Travelers Companies* (1988) 205 Cal.App.3d 691, 694-695 [252 Cal.Rptr. 468]; *Doctors' Co. Ins. Services* v. *Superior Court* (1990) 225 Cal.App.3d 1284, 1289 [275 Cal.Rptr. 674].)

The reasoning underlying these results was succinctly summarized by Justice Kaus, writing for the Court of Appeal in a case in which the applicability of section 47(b) itself was at issue. In *Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152], a decision applying the litigation privilege to a claim of abuse of process, he wrote that "The salutary purpose of the privilege [of section 47(b)] should not be frustrated by putting a *new label* on the complaint. If it is desirable to create an absolute privilege in defamation, not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with libel or slander actions while acting for his client, we should not remove one concern and saddle him with another for doing precisely the same thing." (*Id.* at p. 99, italics added.)

That, in effect, is the result plaintiff seeks to achieve here. As noted, the conduct of defendants alleged in the complaint is clearly communicative and

otherwise within the scope of section 47(b). It is thus absolutely immune from civil tort liability, including plaintiff's interference with contract and related claims. To permit the same communicative acts to be the subject of an injunctive relief proceeding brought by this same plaintiff under the unfair competition statute undermines that immunity. If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b).

We emphasize that the result we reach is propelled in part by the precise circumstances before us. Plaintiff is an adversary in the collateral failure-to-maintain action brought by the Cedar Village residents; the latter are represented in that action by the same attorneys who are defendants in this action; and defendant Green is one of the plaintiffs in that same action. Apart from spawning yet another layer of litigation, placing in the hands of a litigation adversary a weapon with the tactical potential of a statutory unfair competition claim for injunctive relief would promote all of the evils we have described above as accompanying retaliatory suits based on litigation-related communications. (See, *ante*, at pp. 1195-1196.)

Permitting plaintiff to proceed would produce other distortions. In the typical derivative action filed in the wake of allegedly tortious litigation-related communications, the aggrieved plaintiff had been a party in the antecedent proceeding in which the challenged communications occurred, and now seeks redress for injuries alleged to have resulted from them. Unless the conditions requisite to a malicious prosecution action are pleaded and proven, section 47(b) denies relief in such circumstances, not only because that result is deemed necessary to secure the greater interest in ensuring unhindered access to the courts, but also because, as we noted in *Silberg*, *supra*, 50 Cal.3d 205, the original litigation itself provides an efficient forum in which to "expos[e] during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." (*Id.* at p. 214.)

In short, permitting plaintiff's claim for injunctive relief here would upset the carefully constructed balance between "the freedom of an individual to seek redress in the courts and the interest of a potential defendant in being free from unjustified litigation" (*Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc., supra*, 42 Cal.3d at p. 1169) by effectively destroying the availability of the privilege in any case in which a litigation

adversary was prompted to claim that the conduct of the attorney for the opposite party constituted solicitation. Whatever the ultimate outcome of the ensuing unfair competition lawsuit, additional litigation will have been fomented and the presentation of potentially meritorious claims stifled.

Our conclusion that plaintiff's tack of pleading his claim under the unfair competition statute does not override the litigation privilege in this case is reinforced by the fact that the policy underlying the unfair competition statute can be vindicated by multiple parties other than plaintiff under the broad standing provision of Business and Professions Code section 17204. Apart from the overreached client, these litigants include the Attorney General, district attorneys, and certain city attorneys. (*Ibid.*) Importantly, members of the public who, unlike plaintiff, are not adversaries in collateral litigation involving the same attorneys also have standing to pursue unfair competition claims under the statute. (*Ibid.*) Finally, as noted, *ante*, both the State Bar and prosecutorial authorities are authorized to pursue additional sanctions against attorney solicitation of the sort alleged in the amended complaint.

Given the importance of the policy favoring judicial access, and of the role played by the litigation privilege as a means of effectuating that policy, we conclude that plaintiff may not avoid the bar of section 47(b) by casting his claim as one for injunctive relief under the unfair competition statute.

## V

The judgment of the Court of Appeal is reversed and the cause is remanded with directions to affirm the judgment of the trial court.

Lucas, C. J., Mosk, J., and Kennard, J., concurred.

BAXTER, J.—I concur in the majority's reasoning and result as to plaintiff's claim for damages. I respectfully dissent, however, from the majority's decision to the extent that it precludes plaintiff's claim for injunctive relief. In an attempt to impose its view of good public policy, the majority judicially repeals a detailed and considered legislative remedy. The result is even more anomalous than the approach. A person who is entirely unaffected by illegal attorney solicitation can bring an action to enjoin the misconduct. A person, however, who is directly harmed by an attorney's illegal solicitation has no direct judicial recourse. The result is even more troublesome on a broader level. In an era of increased budgetary and time constraints on this state's judiciary, the majority precludes effective enforcement of the ban on unlawful attorney solicitation.

The majority acknowledges that attorney solicitation, as defined in Business and Professions Code section 6153, is unlawful. (Maj. opn., *ante*, at p. 1200.) Business and Professions Code section 17203, in turn, provides that, "Any person who engages, has engaged, or proposes to engage in unfair competition *may be enjoined* in any court of competent jurisdiction." (Italics added.) We have explained that, ". . . 'unfair competition' is not restricted to deceptive or fraudulent conduct but extends to any *unlawful* business practice . . . . The Legislature apparently intended to permit courts *to enjoin* ongoing wrongful business conduct in whatever context such activity might occur . . . ." (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660], second italics added.) Furthermore, Business and Professions Code section 17204 makes clear that virtually any member of the public may seek *injunctive* relief from unlawful business practice.

These statutes point to one simple conclusion. Unlawful attorney solicitation may be enjoined. For the most part, the majority does not contend otherwise, acknowledging that almost any member of the public has standing to bring an action to enjoin such misconduct. The majority's only exception is the person directly harmed by the illegal conduct, that is, the person against whom the litigation was unlawfully solicited. I shall explain why I cannot concur in this strange result.

### 1. *The majority's view of public policy*

I think it important to meet the majority's fundamental premise that sound public policy supports the majority's choice to disregard the statutory provisions for injunctive relief. The majority's view appears to be that this court may disregard a statute whenever doing so facilitates our personal policy preferences. This is not tenable. No matter how strongly *this court* might believe that good public policy should prevent injunctive relief, *the Legislature* has determined for good or bad that injunctive relief is available. "Our function is not to judge the wisdom of statutes." (*Wells Fargo Bank* v. *Superior Court* (1991) 53 Cal.3d 1082, 1099 [282 Cal.Rptr. 841, 811 P.2d. 1025]; *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 804-805 [268 Cal.Rptr. 753, 789 P.2d 934].) What a statute *should* do is beyond our authority to decide. (*New York Times Co.* v. *Superior Court* (1990) 51 Cal.3d 453, 463 [273 Cal.Rptr. 98, 796 P.2d 811].) We have no valid basis on which to usurp the Legislature's role. Indeed, by disregarding Business and Professions Code sections 17203 and 17204, the majority also necessarily disregards Code of Civil Procedure section 1858, which states: "In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ."

Moreover, the majority contradicts its own public policy argument in favor of unfettered illegal solicitation and the resulting access to the courts. To make its result more palatable, the majority acknowledges that the "broad standing provision of Business and Professions Code section 17204" allows "multiple parties other than plaintiff" to enjoin unlawful attorney solicitation. (Maj. opn., *ante*, at p. 1204.) The potential enforcers include everyone other than the party against whom the unlawful solicitation is directed: the Attorney General, district attorneys, certain city attorneys, city prosecutors, and most importantly, any member of the public who is not the soliciting attorney's adversary in the underlying litigation. Put in plain language, the result is that every member of the public—except for one, the victim—can seek injunctive relief. By acknowledging a potentially unlimited class of plaintiff-enforcers, the majority seems to undercut its preferred policy of unfettered judicial access.[1]

The majority's reliance on nonparty enforcers is questionable in another respect. There is no evidence in the record that any of the public officials identified by the majority have ever intervened in a private dispute to enjoin unlawful attorney solicitation. Even more unrealistic is the notion that private citizens with no stake in a dispute will expend time and resources to seek injunctive relief that will not benefit them. The majority's reliance on private enforcers is contradictory. Either, as noted above, it defeats unfettered access by allowing an unlimited class of enforcers or, alternatively, the reliance is unrealistic, thereby undercutting the majority's view that unaffected citizens will solve the problem of unlawful attorney solicitation.

Perhaps most interesting is that the majority's rule sows the seeds of its own demise. Under the majority's rule, a person against whom an attorney unlawfully seeks litigation cannot seek injunctive relief. Any nonaffected member of the public, however, is allowed to seek such relief. Thus, all the solicitation victim need do to avoid the majority's restriction of his ability to seek injunctive relief is to persuade a friend, relative, or colleague to bring an injunctive relief action as a member of the public—a procedure the majority explicitly approves. Indeed, there is no legal or ethical reason why the solicitation victim could not agree to fund such an action, e.g., by paying the citizen-plaintiff's costs and legal fees. The majority serves little purpose by creating a rule under which a victim can do indirectly that which he cannot do directly.

---

[1]Although I have referred to the person against whom litigation is unlawfully solicited as being a victim, I also believe the prospective client who is unlawfully solicited is a victim as well. Apparently, the majority would allow the prospective client to seek injunctive relief. This result creates an unfair distinction between victims. The person against whom litigation is unlawfully solicited suffers at least as much, probably greater, harm than the person who is a prospective client.

Nor should we forget the egregious nature of the unlawful conduct the majority's rule will allow to occur unabated. Business and Professions Code sections 6152 and 6153 make it unlawful and criminal for an attorney to use a "runner or capper . . . to solicit any business" for the attorney in any public or private place. (Bus. & Prof. Code, § 6152.) Put simply, the Legislature chose in sections 6152 and 6153 to make unlawful and criminal the worst forms of attorney solicitation. The majority, however, precludes any effective enforcement of the legislative ban.

## 2. *Statutory conflict*

I also depart from the majority's approach to the "apparent conflict" it perceives between Civil Code section 47, subdivision (b) (hereafter, Civil Code section 47(b)) and the Business and Professions Code provisions for injunctive relief from unlawful business practices. Civil Code section 47's privilege for communications in the course of a judicial proceeding was first enacted in 1872, more than a century ago. Business and Professions Code sections 6152 and 6153, the statutory proscriptions of attorney solicitation, were enacted more than 60 years later, in 1939. I find it difficult to believe the Legislature intended to prohibit—indeed, make criminal—that which was privileged.

Moreover, when, in 1977, the Legislature enacted Business and Professions Code sections 17203 and 17204, providing for injunctive relief from an unlawful business practice, it was clear that attorney solicitation was an unlawful practice under already-enacted Business and Professions Code section 6152. It is not reasonable to conclude that the Legislature would have provided for injunctive relief against an unlawful practice (attorney solicitation) if the Legislature believed such relief was prohibited by Civil Code section 47(b). The majority presumably believes the Legislature was unaware of a prohibition in Civil Code section 47(b) against injunctive relief and inadvertently created a conflict by providing for such relief under Business and Professions Code sections 17203 and 17204. I am reluctant to attribute such ignorance to the Legislature. I am also nonplussed as to how the majority finds a conflict between the two statutes. When the Legislature enacted Business and Professions Code sections 17203 and 17204 allowing for injunctive relief, there was no decision by this court holding that solicitation is privileged under Civil Code section 47(b). Thus, when it enacted sections 17203 and 17205, the Legislature could not have created a conflict between those provisions and something that did not then exist—the privilege for unlawful attorney solicitation that we announce for the first

time today. The conflict perceived by the majority is of its own making, not the Legislature's.[2]

Subsequent events also refute the majority's view that injunctive relief is available only to those not harmed by the unlawful solicitation. In 1991, the Legislature amended Business and Professions Code section 6154 to provide that "Any contract for professional services secured by an attorney at law or law firm in this state through the services of a runner or capper is void. In any action against any attorney or law firm under the Unfair Practices Act . . . any judgment shall include an order divesting the attorney or law firm of any fees and other compensation received pursuant to any such void contract." At a minimum, this amendment makes clear that the State Bar disciplinary system was not viewed by the Legislature as the exclusive means of enforcing the statutory ban on attorney solicitation. Moreover, the majority creates an anomaly in light of this divestiture provision. The victim of unlawful attorney solicitation is precluded from any relief—compensatory or injunctive. Any other citizen, however, can obtain not only injunctive relief, but also the additional monetary relief under Business and Professions Code section 6154. The litigation equivalent of a bounty hunter can obtain monetary relief without showing any harm. A demonstrably harmed litigant, however, is handed only a platitude as to the need for more litigation. Under the majority view, it seems as if everyone but the victim is protected or compensated.

### 3. Majority's authorities

Nor am I persuaded by the authorities on which the majority relies. The obvious point should be made first. None of the decisions cited by the majority dealt with attorney solicitation and, more important, none of them

---

[2]The majority states that "[I]t is late in the day to contend that communications with 'some relation' to an *anticipated* lawsuit are not within the privilege." (Maj. opn., *ante*, at p. 1194.) This statement misses the mark. Although *some* communications have been held to be privileged, in none of the cases cited by the majority has *unlawful solicitation* been deemed privileged. (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405] [filing of lis pendens]; *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386 [182 Cal.Rptr. 438] [negligent medical report submitted to law enforcement authorities]; *Rosenthal* v. *Irell & Manella* (1982) 135 Cal.App.3d 121 [185 Cal.Rptr. 92] [communications to an insurer]; *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861 [100 Cal.Rptr. 656] [statement by witness to attorney]; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573 [131 Cal.Rptr. 592] [attorney's demand letter on behalf of existing client]; *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484 [104 Cal.Rptr. 650] [alleged false building permit submitted by nonattorneys].) Indeed, in the two cases in which the claim was based on an alleged communication by an attorney, it was clear that the communication was on behalf of the attorney's *existing* client. There was no unlawful communication meant to secure a new client. (*Rosenthal* v. *Irell & Manella, supra,* 135 Cal.App.3d 121; *Lerette* v. *Dean Witter Organization, Inc., supra,* 60 Cal.App.3d 573.)

established any rule under which the victim of an illegal business practice was denied relief while at the same time members of the general public were allowed relief.

In *Ribas* v. *Clark* (1985) 38 Cal.3d 355 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417], which the majority calls the "closest precedent in point," the court noted that, in applying the judicial proceedings privilege of Civil Code section 47(b), the court would not distinguish between common law and statutory causes of action for damages for invasion of privacy. The court did not consider any issue as to injunctive relief. *What is relevant, though, is that the court did allow the plaintiff to pursue an action for substantial statutory penalties. Ribas* makes clear that the privilege under Civil Code section 47(b) does not necessarily preclude all remedies, especially those created by other statutes. If the plaintiff in *Ribas* was allowed to seek substantial monetary penalties, I see no reason why the present plaintiff should not be allowed to seek injunctive relief. After all, injunctive relief is less likely than monetary penalties to have a chilling effect on court access.

Equally inapposite and unpersuasive is the majority's reliance on Court of Appeal cases applying our decision in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*), in which we held that Insurance Code section 790.03, subdivision (h) did not provide a private cause of action for damages against insurers. The linchpin of our holding was that "[T]he Legislature has not manifested an intent to create such a private cause of action." (46 Cal.3d, at p. 305.) The *Moradi-Shalal* plaintiff did not seek injunctive relief, so there was no issue before this court as to whether such an action would have been proper under the Business and Professions Code or otherwise. To the extent, however, that we touched on the issue, we suggested that injunctive relief would have been appropriate. More specifically, in response to the argument that our decision would eliminate any meaningful redress for abuses by insurers, we explained that, "[T]he courts retain jurisdiction to impose civil damages *or other remedies* against insurers in appropriate common law actions . . . ." (*Id.*, at p. 304, italics added.)

In the subsequent Court of Appeal cases noted by the majority, the plaintiffs sought to overcome the effect of *Moradi-Shalal, supra,* 46 Cal.3d 287, by recasting their causes of action on grounds other than the Insurance Code. As the majority notes, the Courts of Appeal refused to allow the attempted circumvention. The majority, however, reads too much into those decisions. The first was *Lee* v. *Travelers Companies* (1988) 205 Cal.App.3d 691 [252 Cal.Rptr. 468], in which the court refused to allow the plaintiff to plead around *Moradi-Shalal, supra,* 46 Cal.3d 287, by alleging common law

causes of action for damages. There was no issue as to injunctive relief under the Business and Professions Code or otherwise. Similarly, in *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093 Cal.App.3d 1093 [257 Cal.Rptr. 655], the court refused to allow the plaintiff to avoid *Moradi-Shalal, supra,* 46 Cal.3d 287, by seeking *to recover damages* under Business and Professions Code section 17203. Again, there was no issue as to injunctive relief. The same was true in *Maler* v. *Superior Court* (1990) 220 Cal.App.3d 1592 [270 Cal.Rptr. 222] and in *Doctors' Co. Ins. Services* v. *Superior Court* (1990) 225 Cal.App.3d 1284 [275 Cal.Rptr. 674], in which the courts did not consider whether *Moradi-Shalal, supra,* 46 Cal.3d 287, precluded injunctive relief.

In only one of the cases cited by the majority is there even a reference to injunctive relief. In *Safeco Ins. Co.* v. *Superior Court* (1990) 216 Cal.App.3d 1491 [265 Cal.Rptr. 585] (*Safeco*), the plaintiff sought *damages* under both the Insurance Code and Business and Professions Code section 17200, and the court correctly rejected this attempt to circumvent *Moradi-Shalal, supra,* 46 Cal.3d 287. In describing the plaintiff's claims, the court also stated that "Under this second theory [the Business and Professions Code], plaintiff claimed an entitlement *to an injunction,* compensatory damages, additional compensation for prosecuting the action, punitive damages, and attorneys' fees." (*Safeco, supra,* 216 Cal.App.3d at p. 1493, italics added.) The court explained that "[t]he facts at bench are indistinguishable from those in *Moradi-Shalal*[*, supra,* 46 Cal.3d 287]." (*Id.,* at p. 1494.) Of course, that view was not entirely correct. The cases were different because in *Moradi-Shalal, supra,* 46 Cal.3d 287, there was no claim for injunctive relief. As important, nothing in *Safeco, supra,* 216 Cal.App.3d 1491, suggests that the claim for injunctive relief was anything more than a makeweight allegation. For all practical purposes the suit appears to have been for compensatory and punitive damages. The fact that the court never even discussed the claim for injunctive relief (the entire discussion in the opinion was a mere three paragraphs) suggests that no serious issue was ever raised as to injunctive relief.

In short, the majority relies on five Court of Appeal decisions—four of which have no relevance at all, and one of which has a three-word reference to the issue.

The majority's reliance on the progeny of *Moradi-Shalal, supra,* 46 Cal.3d 287, is misplaced in two other, perhaps more fundamental, respects. First, the issue in that case was whether the Legislature had intended, in enacting a particular statute (Ins. Code, § 790.03, subd. (h)), to create a private cause of action *for damages.* In light of our holding that no such cause of action

was intended, it would have been anomalous for subsequent courts to conclude that the same relief (i.e., *damages*) could be recovered for the same misconduct, merely by seeking them under a different statute. Whether different relief could be sought under a different statute is another question.

Second, in the post-*Moradi-Shalal* context, the courts were faced with two *statutes*. We held in *Moradi-Shalal* that the *Legislature* intended no private cause of action under one statute (Ins. Code, § 790.03, subd. (h)). To allow the same relief under a different statute would require the conclusion that the Legislature intended to give with one hand what it took away with another. That is not the situation now before us. To the contrary, the Legislature has in one statute provided for injunctive relief for unlawful business practices. (Bus. & Prof. Code, § 17203.) There is no competing statute in which the Legislature has manifested an intent to preclude such relief.

### 4. *The majority's practical result*

Rather than buttressing the integrity of the judicial system, today's decision taints it. Adequate access to the judicial system is one thing. Illegal access is another. No one disputes that attorney solicitation is wrong and repugnant—so much so that the Legislature has made it unlawful, even criminal. The court, however, refuses to allow the victim of this crime any direct redress. Up to a point, I agree, as reflected by my concurrence in the majority's decision not to allow recovery of *damages*. But prohibiting the victim from seeking injunctive relief tips the balance too far in favor of criminal conduct.

Conversely, allowing injunctive relief does not in any meaningful way restrict *legal* access to the courts. Unlike a separate claim for damages, a request for injunctive relief can be decided quickly and relatively easily. If solicitation is not found, that will be the end of the matter, and the attorney (as well as his clients) will have full judicial access. If solicitation is found, it will be nipped in the bud, as it should be, but any right to legal access remains unimpeded. Moreover, regardless of whether any unlawful solicitation is found, the underlying action is allowed to proceed, regardless of whether it has any merit. That alone ensures full judicial access for litigants. The only person whose access is restricted is the attorney who engages in unlawful solicitation.

Prohibiting injunctive relief also makes no sense to the victim. Why must he stand idly by while litigation against him is unlawfully solicited? That is a crime in and of itself, regardless of the possible merit of the litigation. The

victim should not be denied the statutory right to enjoin the criminal conduct.[3]

Finally, I am troubled by the majority's fundamental premise that we must take the draconian measure of refusing a victim of unlawful solicitation his specific, concrete statutory right so that we can ensure unfettered access to the courts. California has tens of thousands of competent, ethical attorneys. Any person with even a remotely meritorious claim can and will find an attorney. (One consequence of the majority's rule is to penalize that vast majority of attorneys who refuse to engage in unlawful solicitation.) By enforcing the statutory remedy for unlawful solicitation, we would not be restricting judicial access for any claim or any person. The only person who would be stopped at the courthouse door would be the attorney who stoops to engage in unlawful solicitation. His client can come through that door and have his full day in court. We need not encourage the crime of solicitation to ensure judicial access.

For the foregoing reasons, I concur in the majority's reversal of the judgment of the Court of Appeal to the extent that the judgment allowed plaintiff to seek damages for the unlawful solicitation. I would affirm the Court of Appeal's judgment, however, to the extent that it allowed plaintiff to seek injunctive relief.

Panelli, J., and George, J., concurred.

---

[3]The majority suggests the victim has adequate recourse in the form of a malicious prosecution action. (Maj. opn., *ante*, at p. 1200.) That is impractical. It ignores the fact that unlawful solicitation is a crime in and of itself. Whether the solicitation is unlawful has nothing to do with whether the action solicited is meritorious. Thus, even if the underlying litigation proves successful, that does not retroactively eliminate the fact that a crime was committed. The defendant in such an action, however, could not thereafter recover for malicious prosecution because he could not show that it had terminated in his favor. Nor is it clear that the majority would allow recovery even for solicitation of an action that ultimately proves meritless. The majority would apparently allow recovery of damages for malicious prosecution of *the action*, but not for the wrongful solicitation itself. (Maj. opn., *ante*, at p. 1200, fn. 6.)