[No. E037230. Fourth Dist., Div. Two. Dec. 16, 2005.]

AMERICAN PRODUCTS CO., INC., Plaintiff and Appellant, v.
LAW OFFICES OF GELLER, STEWART & FOLEY, LLP, et al.,
Defendants and Respondents.

**COUNSEL**

Reid & Hellyer, David G. Moore and Michael G. Kerbs for Plaintiff and Appellant.

Lubrani & Smith, Michael D. Lubrani and Daniel A. Cantor for Defendants and Respondents.

**OPINION**

**HOLLENHORST, J.**—Plaintiff American Products Co, Inc. (APC), appeals after summary judgment was granted in favor of defendants Law Offices of Geller, Stewart & Foley, and Michael S. Geller (collectively referred to as the Geller defendants) in APC's action for intentional interference with prospective economic advantage/contractual relationship and violating Business and

Professions Code section 17200. The principal issue on appeal is the extent of the litigation privilege in Civil Code section 47, subdivision (b) (section 47(b)) as it applies to the Geller defendants' demand letters to some of APC's customers prior to the filing or initiation of a lawsuit.

## PROCEDURAL BACKGROUND AND FACTS

APC is a manufacturer of after-market automotive accessories. Its accessories include accessory lighting kits for vehicles, such as specialty parking light kits and specialty exhaust tip lights. APC's products are sold in automotive parts and accessory stores, such as The Pep Boys-Manny, Moe & Jack of California (Pep Boys) and CSK Auto, Inc., doing business as Kragen Auto Parts (Kragen).

On September 5, 2002, the Geller defendants wrote to Pep Boys and identified their client as Michael D. Freeman (Freeman). The letter stated that Freeman recently purchased a blue lights accessory kit from a Pep Boys store, that such lights were illegal, and that Freeman only found out that they were illegal upon arriving home with the kit. The letter alleged that Pep Boys's sale of this product constitutes unfair business practices within the meaning of Business and Professions Code section 17200 and violates the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.). The letter demanded that Pep Boys stop selling the lights, post notices in all their stores about the illegal products with an offer for full refund, pay $2,500 to Freeman, and pay $10,000 to the Geller defendants.

On January 6, 2003, the Geller defendants wrote to Kragen on behalf of Freeman. This time Freeman had purchased an Exhaust Tip LED. The letter was substantially similar to the letter sent to Pep Boys in September 2002. Again, the Geller defendants claimed that an illegal product had been sold to Freeman and that Freeman had only found out that the product was illegal[1] upon arriving home. Again, the Geller defendants asserted violations of Business and Professions Code section 17200 and Civil Code section 1750 et seq. The same demands made of Pep Boys were made to Kragen.

On January 15, 2003, Freeman filed a complaint against Pep Boys alleging violations of Business and Professions Code section 17200. He was repre-

---

[1] Despite the Geller defendants' general statement that the lights are "illegal," the record suggests that they are only illegal if they are installed on vehicles that are operated on California roads. There is no evidence that such lights may not be used on show cars or cars being driven on the roads of other states.

sented by the Geller defendants. On April 2, an almost identical action was filed by Freeman against Kragen. Again, he was represented by the Geller defendants. Because of the lawsuits, Pep Boys and Kragen informed APC that they would stop selling the accessories which could not be used legally on California roads and would be returning the ones they had in stock.

Upon receiving the news from Pep Boys and Kragen, APC initiated this action against the Geller defendants. The first amended complaint alleges a violation of Business and Professions Code section 17200, interference with a contractual relationship, and intentional interference with prospective economic advantage. APC claimed that the Geller defendants have sent other California businesses demand letters wherein they alleged that the businesses had violated our state's unfair competition and consumer protection statutes without a good faith basis. APC further claimed that the Geller defendants have initiated lawsuits, based on these demand letters, against the same businesses without a good faith basis. On August 11, 2003, the Geller defendants filed their general denial and asserted a number of affirmative defenses.

On January 27, 2004, the Geller defendants moved for summary judgment on the grounds that their letters to Pep Boys and Kragen were absolutely protected by the litigation privilege of section 47(b). Although APC filed its opposition and the Geller defendants filed their reply, hearing on the motion was continued several times to allow APC to conduct discovery.

After conducting further discovery, APC requested the trial court to take judicial notice of 24 matters in which Freeman or Mr. Geller were named plaintiffs. See appendix A to this opinion. Freeman acknowledged that he has been a plaintiff in some 15 to 20 other lawsuits. He estimated that he has been a plaintiff in roughly 25 lawsuits over the last three years in which the Geller defendants have represented him.

Other evidence offered by APC shows that Freeman was an attorney who was found guilty of seven counts of bankruptcy fraud in 1997. He resigned from the State Bar on April 13, 1997, with charges pending. In 2002, he was employed by the Geller defendants as a paralegal. Regarding this case, Freeman stated that at the end of August 2002, he purchased some blue lights from Pep Boys in Moreno Valley because he "had previously purchased . . . similar items from another auto parts store. . . . [¶] With respect to one of . . .

the two lawsuits, [he] purchased a lighting product that [he] suspected might be unlawful to install on a car, but [he] wanted to confirm. And in the next [lawsuit he] purchased it to see if that product was also unlawful to install on the car. So . . . with respect to both of them [he] had a suspicion that they were not lawful to be installed. But [he] didn't learn . . . that it was indeed until [he] later consulted with Mr. Geller." Richard A. Stewart, a named partner in the Geller defendants' law firm is a Riverside County Sheriff reserve deputy who has issued citations to motorists for using the same automotive lighting accessory kits that are the subject of Freeman's actions against Pep Boys and Kragen.

The demand letters sent prior to initiation of the actions against Pep Boys and Kragen claimed that the products "are not allowed on any private passenger car ever!" If Freeman had put the products on his car, then he "could have been severely fined and stopped by the police or highway patrol for no other reason than he installed [the products], which [Pep Boys and Kragen] sell in [their] California stores." Additionally, the letters claimed that "even if there were a warning, we still believe that it would be illegal, there was no warning of any kind associated with these [products]." The letters stated the Geller defendants' belief that "the sale of these parts is illegal." The letters informed Pep Boys and Kragen that "[r]emedies under the Consumers Legal Remedies Act include, but are not limited to, injunctive relief, restitution, actual damages, punitive damages and full attorneys fees. [The Geller defendants'] office currently charges $325 per hour for consumer law. [¶] The Consumers Legal Remedies Act requires that [the Geller defendants] give [Pep Boys and Kragen] 30 days notice prior to filing suit. This letter constitutes [the Geller defendants'] 30 days notice. If [their] demands are not met within the next 30 days, a class action suit may be filed without further notice to you. [The Geller defendants] will seek disgorgement for all sales made of such illegal [products] as well as damages for anyone that actually purchased them."

The Geller defendants demanded Pep Boys and Kragen to immediately stop selling the products "that have no legitimate purpose and are illegal to use on the street"; post notice in all California stores informing purchasers "about the illegal products and offering them full refunds"; pay Freeman $2,500 for "his time, trouble and effort"; and pay the Geller defendants "a sum to be negotiated, to include all the necessary agreements, but in the approximate sum of $10,000 if suit is not brought."

In its supplemental opposition, APC claimed "the litigation privilege does not apply to communications and statements made which are not in the furtherance of the objects of litigation." In support of its claim, APC argued that the Geller "defendants sent demand letters which, as part of their content, contained the statement that the subject products as manufactured by APC were illegal. [However, t]he subsequent litigation filed on behalf of Freeman did not allege, nor did it contend, that APC's products were illegal. Moreover, the testimony of [Mr. Geller] reflects that his opinion as to the legality of the products produced by APC was formed prior to the time that the subject letters were sent. . . . As such, [the] statement with respect to the alleged illegality of the APC products were [*sic*] not made in conjunction with a legitimate basis of subsequently pursued litigation."

In an order filed on December 1, 2004, the trial court found that the litigation privilege applies and granted summary judgment in favor of the Geller defendants. The court stated: "[APC] argued that the purchase of its products was not a legitimate transaction involving an unsuspecting consumer, but was instead a transaction designed to extort funds. However, this premise was not supported by the evidence offered by [APC]. There were no facts to support this conclusion. Instead, the facts, to which [APC] failed to cite, actually supported the conclusion that at the time the prelitigation demand letters were sent, a judicial proceeding would be contemplated if the letters did not result in a resolution. Furthermore, the law, even as cited by [APC], clearly states that neither [*sic*] intent, motive, morals or ethics constitute a bar to the application of the litigation privilege provided by *Civil Code* § 47.

"[APC] also argued that the underlying lawsuits did not claim that the subject products were illegal. Accordingly, [APC] claimed that the prelitigation demand letters had no relation to a proceeding contemplated in good faith. However, the facts did not support this argument, nor is there any law to support this argument as well. In fact, contrary to [APC's] assertion, both of the underlying lawsuits repeatedly referenced the illegality of [APC's] products.

"In short, the Court found that such opposing evidence failed to raise a triable issue of material fact because the litigation privilege provided by *Civil Code* § 47 applied to [the Geller d]efendants' demand letters notwithstanding [APC's] opposing evidence. Specifically, the Court held that the demand letters were sent in good faith since a serious contemplation of litigation

existed at the time the letters were sent. The Court further held that [APC] failed to provide any evidence to the contrary, either through direct testimony or statistical evidence." APC appeals.

## STANDARD OF REVIEW

Our Supreme Court has described the purpose of the law of summary judgment to be "a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.] [¶] Under summary judgment law, any party to an action, whether plaintiff or defendant, 'may move' the court 'for summary judgment' in his favor on a cause of action (i.e., claim) or defense [citation]—a plaintiff 'contend[ing] . . . that there is no defense to the action,' a defendant 'contend[ing] that the action has no merit' [citation]. The court must 'grant[]' the 'motion' 'if all the papers submitted show' that 'there is no triable issue as to any material fact' [citation]—that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law [citations]—and that the 'moving party is entitled to a judgment as a matter of law' [citation]." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

On an appeal from a grant of summary judgment, an appellate court's standard of review is de novo. (*Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973 [135 Cal.Rptr.2d 718], citing *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94].) "An appellate court determines de novo whether there is a genuine issue of material fact and whether the moving party was entitled to summary judgment as a matter of law. [Citation.]" (*Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 430 [281 Cal.Rptr. 367], fn. omitted.)

## THE LITIGATION PRIVILEGE

■ "The litigation privilege protects a 'publication or broadcast . . . [¶] . . . [¶] (b) In any . . . (2) judicial proceeding . . . .' [Citation.] The privilege applies to 'any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) to have some connection or logical relation to the action.["] [Citations.]' [Citations.]

"It has long been the law that communications that bear 'some relation' to an anticipated lawsuit fall within the privilege. [Citations.] The privilege has been broadly applied to demand letters and other prelitigation communications by attorneys. [Citations.]

" '[A] prelitigation statement is protected by the litigation privilege of [section 47(b)] when the statement is made in connection with a proposed litigation that is "contemplated in good faith and under serious consideration. [Citation.]" [Citations.]' [Citations.] '[T]he good faith, serious consideration of litigation test is not . . . a test for malice and it is not a variation of the "interest of justice" test.' [Citation.] Rather, it is 'addressed to the requirement the statements "have some connection or logical relation to the action.["] [Citations.]' [Citation.] Thus, if the statement is made with a good faith belief in a legally viable claim and in serious contemplation of litigation, then the statement is sufficiently connected to litigation and will be protected by the litigation privilege. [Citation.] If it applies, the privilege is absolute. [Citation.]" (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 919 [20 Cal.Rptr.3d 385].)

APC contends the trial court erred in finding the litigation privilege applies here because there is a triable issue about whether the Geller defendants sent the demand letters " ' "with a good faith belief in a legally viable claim and in serious contemplation of litigation." ' " (*Blanchard v. DIRECTV, Inc.*, *supra*, 123 Cal.App.4th 903, 919.) It argues that the "employment of the litigation process solely for purposes of creating income in the form of attorney's fees is not a legitimate litigation objective." Moreover, APC contends that the litigation privilege does not preclude actions by third parties for unfair business practices. (*Rubin v. Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Kashian v. Harriman* (2002) 98 Cal.App.4th 892 [120 Cal.Rptr.2d 576].) Because we agree with APC's last contention, we need not address its first.

As our colleagues in the Fifth District observed, when faced with a situation like that presented by the facts in this case, the litigation privilege does not apply. (*Kashian v. Harriman*, *supra*, 98 Cal.App.4th 892, 924.) In *Kashian*, plaintiff, chairman of the board of trustees of Community Hospitals of Central California (Community), initiated an action against an attorney (Harriman) and an environmental interest group for unfair business practices and defamatory statements. The controversy arose when Community planned to build and operate a for-profit heart hospital in partnership with a group of local physicians. (*Id.* at p. 899.) Concerned groups, including Harriman and his

clients, wrote letters to the Attorney General's office requesting an investigation into unfair business practices and "a possible conflict of interest between Kashian's private business interests and his role as chairman of the [Community's] board." (*Id.* at p. 901.) The local newspaper published a news article reporting on Harriman's letter, focusing on the accusations about Kashian. Kashian was quoted "as saying the accusations were ' "completely false." ' " (*Ibid.*) "Harriman reportedly refused to comment on the letter . . . ." (*Ibid.*)

■ In response to the lawsuit, Harriman filed a motion to strike the complaint on the grounds that, among other things, both his environmental litigation activities and his letter to the Attorney General were absolutely privileged under section 47(b). (*Kashian v. Harriman, supra,* 98 Cal.App.4th 892, 902–903.) The trial court agreed and Kashian appealed. On appeal, the Fifth District offered the following discussion:

" 'California law recognizes two types of privileged communications— communications which are absolutely privileged and communications which are qualifiedly or conditionally privileged. If absolutely privileged, there is no liability even if the defamatory communication is made with actual malice. If the privilege is only conditional or qualified, a finding of malice will prevent the communication from being found privileged.' [Citations.] [¶] . . . [¶]

"Civil Code section 47, subdivision (b) defines what is commonly known as the 'litigation privilege.' 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.' [Citation.]

■ "The litigation privilege is absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm. [Citation.] Put another way, application of the privilege does not depend on the publisher's 'motives, morals, ethics or intent.' [Citation.] Although originally applied only to defamation actions, the privilege has been extended to *any* communication, not just a publication, having 'some relation' to a judicial proceeding, and to *all* torts other than malicious prosecution. [Citations.] Moreover, '[t]he litigation privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings. [Citation.] The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action. [Citation.]

[¶] . . . [¶] '[The] absolute privilege exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing. [Citation.] The privilege is based on "[t]he importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity." [Citation.]' [Citation.]

"If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law. [Citation.] Any doubt about whether the privilege applies is resolved in favor of applying it. [Citation.]" (*Kashian v. Harriman, supra*, 98 Cal.App.4th 892, 912–913.)

Kashian argued against application of the litigation privilege on the following grounds: (1) "Harriman's 'practice of filing complaints with sham plaintiffs for the purpose of deceiving the target defendants' . . . was conduct rather than speech" (*Kashian v. Harriman, supra*, 98 Cal.App.4th 892, 915); (2) Harriman's statements in connection with his environmental litigation were not made to serve the purpose of litigation (*id.* at pp. 917–918); and (3) because he (Kashian) was not a party to any of the environmental suits underlying the first cause of action, the litigation privilege therefore does not apply to his unfair competition claim (*id.* at pp. 921–922). Rejecting the first two arguments, the Fifth District found the third applicable.

Kashian's third argument was based on *Rubin v. Green, supra*, 4 Cal.4th 1187. "*Rubin* was a suit for damages by the owner of a mobilehome park (Cedar Village) against a resident (Green) and her attorney, alleging they were unlawfully soliciting other residents to join an anticipated action against the owner for failing to maintain the park. When the residents later filed their failure-to-maintain action, the owner amended his suit to add an unfair competition claim under Business and Professions Code section 17200 et seq., seeking to enjoin the residents' alleged acts of harassment. The residents demurred to the amended complaint on the ground their conduct was privileged under [section 47(b)]. The trial court sustained the demurrer and dismissed the owner's suit. The Court of Appeal reversed. The Supreme Court reversed the appellate court, holding the privilege applied to the tort causes of action for damages based on the defendants' alleged unlawful solicitation.

"The court then considered whether the owner, notwithstanding the privilege, was entitled to pursue injunctive relief in light of the fact that Business

and Professions Code section 17204 grants any member of the public standing to seek such relief against unfair competition. After concluding, in effect, that the defendants' conduct fell within the broad definition of unfair competition, the court sought to resolve the 'evident conflict [between] the policy of permitting members of the public to police the spectrum of "unfair competition" [and] the policy embodied in section 47(b) . . . of insuring litigants open access to the courts.' [Citation.] The court cited several decisions in other contexts that had 'rejected the claim that a plaintiff may, in effect, "plead around" absolute barriers to relief by relabeling the nature of the action as one brought under the unfair competition statute.' [Citation.] It then concluded:

■ " 'That, in effect, is the result plaintiff seeks to achieve here. As noted, the conduct of defendants alleged in the complaint is clearly communicative and otherwise within the scope of section 47(b). It is thus absolutely immune from civil tort liability, including plaintiff's interference with contract and related claims. To permit the same communicative acts to be the subject of an injunctive relief proceeding brought by this same plaintiff under the unfair competition statute undermines that immunity. If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, *the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b).*

" '*We emphasize that the result we reach is propelled in part by the precise circumstances before us. Plaintiff is an adversary in the collateral failure-to-maintain action brought by the Cedar Village residents; the latter are represented in that action by the same attorneys who are defendants in this action; and defendant Green is one of the plaintiffs in that same action.* Apart from spawning yet another layer of litigation, placing in the hands of a litigation adversary a weapon with the tactical potential of a statutory unfair competition claim for injunctive relief would promote all of the evils we have described above as accompanying retaliatory suits based on litigation-related communications. [Citation.]

" 'Permitting plaintiff to proceed would produce other distortions. In the typical derivative action filed in the wake of allegedly tortious litigation-related communications, the aggrieved plaintiff had been a party in the

antecedent proceeding in which the challenged communications occurred, and now seeks redress for injuries alleged to have resulted from them. Unless the conditions requisite to a malicious prosecution action are pleaded and proven, section 47(b) denies relief in such circumstances, not only because that result is deemed necessary to secure the greater interest in ensuring unhindered access to the courts, but also because, as we noted in *Silberg* [*v. Anderson* (1990)] 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365], the original litigation itself provides an efficient forum in which to "expos[e] during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." [Citation.]

" 'In short, permitting plaintiff's claim for injunctive relief here would upset the carefully constructed balance between "the freedom of an individual to seek redress in the courts and the interest of a potential defendant in being free from unjustified litigation" [citation] by effectively destroying the availability of the privilege in any case in which a litigation adversary was prompted to claim that the conduct of the attorney for the opposite party constituted solicitation. Whatever the ultimate outcome of the ensuing unfair competition lawsuit, additional litigation will have been fomented and the presentation of potentially meritorious claims stifled.

" 'Our conclusion that plaintiff's tack of pleading his claim under the unfair competition statute does not override the litigation privilege in this case is reinforced by the fact that the policy underlying the unfair competition statute can be vindicated by multiple parties other than plaintiff under the broad standing provision of Business and Professions Code section 17204. Apart from the overreached client, these litigants include the Attorney General, district attorneys, and certain city attorneys. [Citation.] *Importantly, members of the public who, unlike plaintiff, are not adversaries in collateral litigation involving the same attorneys also have standing to pursue unfair competition claims under the statute.* [Citation.] Finally, as noted, *ante*, both the State Bar and prosecutorial authorities are authorized to pursue additional sanctions against attorney solicitation of the sort alleged in the amended complaint.

" 'Given the importance of the policy favoring judicial access, and of the role played by the litigation privilege as a means of effectuating that policy, we conclude that plaintiff may not avoid the bar of section 47(b) by casting his claim as one for injunctive relief under the unfair competition statute.' [Citation.]

"The [*Rubin*] court's conclusion seems to lead to the anomalous result where the litigation privilege extends to an unfair competition claim against an attorney only when the claim is founded on the attorney's misconduct in earlier litigation against the plaintiff, at least if the privilege would also apply to bar a derivative tort action based on the same conduct. Or, as Justice Baxter observed in his dissent in *Rubin*: 'Put in plain language, the result is that every member of the public—except for one, the victim—can seek injunctive relief' against an attorney's unlawful business practices under Business and Professions Code section 17200 et seq. [Citation.]" (*Kashian v. Harriman*, *supra*, 98 Cal.App.4th 892, 922–924, quoting *Rubin v. Green*, *supra*, 4 Cal.4th 1187, 1202–1204.)

■ Thus, the *Kashian* court concluded that while the litigation privilege will extend to an unfair competition claim against an attorney where the claim is founded on the attorney's misconduct in earlier litigation against the plaintiff, such is not the case where the plaintiff was not a party to the earlier litigation. (*Kashian v. Harriman*, *supra*, 98 Cal.App.4th 892, 922–924; *Rubin v. Green*, *supra*, 4 Cal.4th 1187, 1202–1204.) We agree. Here, APC was not a party to any of the litigation that underlies its unfair competition claim against the Geller defendants. Nor is the unfair business practices litigation the subject of APC's other causes of action for interference with a contractual relationship and intentional interference with prospective economic advantage. Thus, it appears APC is simply a member of the public for purposes of the first cause of action, which therefore is not foreclosed by the litigation privilege under *Rubin v. Green*, *supra*, 4 Cal.4th 1187. (*Kashian v. Harriman*, *supra*, 98 Cal.App.4th at p. 924.) To hold otherwise would be to blindly apply the litigation privilege without consideration of the parties.

Because we find that the litigation privilege does not apply in this case, the evidence before the trial court fails to support summary judgment in favor of the Geller defendants. According to APC, the Geller defendants engaged in a "pattern or practice" of initiating litigation for settlement purposes (which is improper and potentially a violation of Business and Professions Code section 17200 et seq.). Based on the record, there is an issue of whether the Geller defendants used our unfair competition law to send out demand letters for purposes of a quick settlement. While there is evidence that lawsuits were initiated, we note that most of the lawsuits were dismissed within months of the complaints being filed. The number of actions initiated and then dismissed less than one year thereafter raises an issue as to whether there was a pattern or practice of filing complaints for settlement purposes.

We are mindful of a similar type of practice by the Trevor Law Group. In 2002 and 2003, the Trevor Law Group found financial success by abusing California's unfair competition law. "The abuse is a kind of legal shakedown scheme: Attorneys form a front 'watchdog' or 'consumer' organization. They scour public records on the Internet for what are often ridiculously minor violations of some regulation or law by a small business, and sue that business in the name of the front organization. Since even frivolous lawsuits can have economic nuisance value, the attorneys then contact the business . . . , and point out that a quick settlement . . . would be in the business's long-term interest." (*People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317 [9 Cal.Rptr.3d 844].)

Regarding APC's other causes of action (interference with a contractual relationship and intentional interference with prospective economic advantage), it argued that the Geller "defendants sent demand letters which, as part of their content, contained the statement that the subject products as manufactured by APC were illegal. [APC maintained that t]his statement jeopardized APC's relationship with Pep Boys and Kragen and, on that basis, APC filed this action." In support of its claims, APC offered evidence of the demand letters sent to Pep Boys and Kragen, as well as, the actions filed against them.

The letters sent to Pep Boys and Kragen stated the Geller defendants' belief that "the sale of these parts is illegal." While the letters referenced the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.) and Business and Professions Code section 17200, the complaints limited the allegations to violations of Business and Professions Code section 17200. The letters suggested that the sale of these parts for any purpose is illegal; however, the complaints specified that "[t]he installation and use of such [products] is illegal on any private passenger vehicle or light truck operated on public roadways in the State of California." While the allegations in the complaints were more specific as to why the Geller defendants claimed that the products were illegal, the demand letters were not. As we stated above, the letters stated that certain APC products "are not allowed on any private passenger car ever!" Given such strong language, we believe that there is an issue as to whether the Geller defendants' actions harmed APC's business relationships with Pep Boys and Kragen.

Accordingly, we conclude that summary judgment was erroneously granted in favor of the Geller defendants.

## DISPOSITION

The judgment is reversed. APC is awarded its costs on appeal.

Ramirez, P. J., and Richli, J., concurred.