Filed 4/17/13  Ramos v. U.S. Bank National Assn. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ANTHONY RAMOS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> U.S. BANK NATIONAL ASSOCIATION et al., <br><br> Defendants and Respondents. | A131750 <br><br> (Solano County <br> Super. Ct. No. FCS036466) |

Plaintiffs Anthony and Isabelle Ramos sued U.S. Bank National Association (the Bank), the Endres Law Firm, and David Endres alleging that an unlawful detainer action filed against the Ramoses by the firm on behalf of the Bank was brought maliciously, without probable cause.  The Ramoses also alleged that the Bank and the Endres firm violated the Unfair Business Practices Act (Bus. & Prof. Code §§ 17200 et seq.) by engaging in a pattern and practice of filing unfounded and malicious unlawful detainer actions in disregard of tenants' rights.  Endres filed a special motion to strike the complaint, and the Bank brought a special motion to strike the malicious prosecution cause of action.  The trial court granted both motions and dismissed the action in its entirety.  We affirm, except with respect to the order striking the Ramoses' cause of action for unfair business practices against the Bank; this was error because the Bank did not file a motion to strike that cause of action.

1

## FACTUAL AND
## PROCEDURAL HISTORY

For some years prior to 2009, the Ramoses resided at 1000 Kellogg Street in Suisun City (the property) as tenants.  Eric Tabernero was the property owner.  In September 2009, the Bank purchased the property at a trustee's sale.  In mid-September, the Bank's attorneys, the Endres Law Firm, by and through David Endres (collectively, Endres), served on the Ramoses a "Notice to Occupant(s) to Vacate Premises" demanding that the premises be vacated and turned over to the new owner within 3, 60 or 90 days, depending upon the nature of the tenancy.  Two days later the Ramoses called Endres and stated they were tenants of the former owner and were in possession of the property pursuant to a lease.  Endres did not receive a copy of the lease, but assumed such a lease existed and therefore gave the Ramoses 90 days to vacate.  The Ramoses did not move out so Endres, on behalf of the Bank, filed a complaint for unlawful detainer on December 18, 2009.  The complaint sought possession of the premises and the "reasonable value for the use and occupancy of the Property" of $70 per day.  The Ramoses, acting in propria persona, filed an answer to the complaint, stating that they had lived at the property for seven and one-half years and had rented the property since 2004; they requested the opportunity to continue to rent the property until such time as they could purchase it.

Trial on the unlawful detainer action was set for January 26, 2010.[1]  On January 21, Kelly Trujillo, the Ramoses' attorney, sent an e-mail to Endres stating that the Ramoses were tenants holding under a bona fide lease set to expire in October 2010,

---

[1] All subsequent dates pertaining to procedural matters are in 2010.

2

that their tenancy was protected under the Protecting Tenants at Foreclosure Act of 2009 (PTFA), and therefore it would be a waste of time and effort to go to trial.[2]

On January 22, Trujillo sent a letter to Endres, enclosing a copy of the Ramoses' lease. Trujillo asserted that the Ramoses were protected from eviction by the PTFA because the lease was executed before the notice of default was recorded, the landlord is not the "child, spouse, or parent of the tenants" and the lease was an arm's-length transaction at fair market value rent. Trujillo requested that the unlawful detainer action be dismissed.

The trial went forward as scheduled. During the trial, Endres and the Bank learned that Tabernero, the lessor, was the Ramoses' son-in-law; they therefore argued that the lease was not "bona fide" under the PTFA because of the familial relationship. Also during the trial the Ramoses introduced into evidence a promissory note (the Note) and two leases. The two leases were dated October 2006 and October 2008, were signed by Tabernero and the Ramoses, and prescribed a monthly rental of $1,600. The 2008 lease was for 24 months, ending October 1, 2010. The Note indicated that in 2006, Tabernero borrowed $56,373.43 from the Ramoses. The Note stated that Tabernero agreed to pay the principal sum "plus interest on the outstanding balance at 2% ($11,274.69) equaling $67,648.12"; that the loan period began on October 1, 2006 and ran for 66 months, through April 2012; and that the Note would be "repaid in equal

---

[2] To the extent relevant here, the PTFA provides that one who takes title to a foreclosed property with a "federally related mortgage" does so subject to certain rights of any bona fide tenant. Unless the purchaser, or a subsequent purchaser, plans to occupy the property as a primary residence, the purchaser must honor any right to occupancy under a bona fide lease entered into before the notice of foreclosure, until the lease terminates. (Protecting Tenants at Foreclosure Act § 702(a)(1); (a)(2)(A).) To be considered bona fide, a lease or tenancy must meet the following requirements: (1) the mortgagor or the child, spouse, or parent of the mortgagor under the contract is not the tenant; (2) the lease or tenancy was the result of an arms-length transaction; and (3) the lease or tenancy requires the receipt of rent that is not substantially less than fair market rent for the property. (*Id.,* § 702(b)(1)-(3).) (The pertinent language of the PTFA was not codified. The language of the public law as enacted can be found in the statutes at large. (See Pub.L. No. 111–22, 123 Stat. 1661).)

3

monthly payments of $1,600.00 per month (in lieu of legal tender) as a Pre-Paid Lease Agreement by and between [Tabernero and the Ramoses]." (Underlining and boldface omitted.) The Note further specified that new lease agreements "shall be assigned" for the periods of October 2006 to October 2008, October 2008 to October 2010, and from October 2010 to April 2012. The Note also contained this recital, in boldface: "Only and upon expiration of lease agreements through April 2012, this Note will be considered Paid in Full as agreed." Although the 2006 lease stated that the rent had been prepaid, the 2008 lease did not.

Judgment was entered in favor of the Ramoses, the court stating: "Court finds that the [Ramoses] are protected under the Protecting Tenants at Foreclosure Act. Under the Act, [the Bank] takes the subject property subject to the lease dated October 1, 2008. Lease expires October 1, 2010. [Ramoses] are ordered to pay rent in the amount of $1,600.00 per month to [the Bank]. [¶] Rental payments shall be made to [the Bank] in care of [its] attorney of record, the Endres Law Firm." The Ramoses were awarded costs of suit in the sum of $450.

The day after trial, Trujillo sent a letter to Endres enclosing a proposed judgment and memorandum of costs. The letter goes on to state: "The judgment indicates that the monthly rent should be made payable to plaintiff in care of the Endres Law Firm. Please advise if the monthly payments should be made elsewhere. [¶] My clients are prepared to make their rental payment for the month of February. It would seem appropriate to discount from the rent the costs awarded to defendants, which total $450.00. Please advise if you have any objection. If not, the rent for February will be $1,150.00." A paralegal in the Endres firm called Trujillo and informed her that the Bank would accept the February rent but would seek back rent from the date of foreclosure, because the Ramoses had been living on the property rent free since October 2009. On January 29, Trujillo sent another letter to Endres stating that the paralegal had informed her that Endres requested that the $450 in costs not be deducted from the rent for record-keeping purposes, and therefore the Ramoses "will submit $1,600 for rent for the month of February" to Endres. With respect to the issue of back rent Trujillo stated:

4

"Unfortunately for your client [the Bank's attorney] expressly waived damages at trial. Furthermore, he failed to raise the issue of back-rent at trial."

Endres considered and researched the question of whether the issue of back rent had been waived at trial and concluded it had not. Specifically, Endres concluded (1) the waiver of "damages" was based on the theory that the Ramoses tortiously held over their tenancy following the foreclosure, and (2) no claim for back rent was made because the Bank took the position that the Ramoses' lease was not bona fide. Accordingly, the amount of past due rent had not been an issue. On February 5, Endres, on behalf of the Bank, served on the Ramoses a three-day notice to pay or quit, seeking payment of rent for the months of October 2009 through January 2010.

On February 10, Trujillo sent a letter to Endres asserting that the back rent issue was barred by res judicata because it had not been raised in the unlawful detainer trial. Trujillo expressed her dismay that Endres had chosen to "disregard the court's judgment" and noted that the Ramoses had made a "timely rental payment for the month of February." The letter included a warning that any action filed would be without legal basis and would lead to a motion for sanctions. Endres responded in a letter to Trujillo, explaining why the firm had concluded that the back rent issue was not before the court in the unlawful detainer action. In essence, Endres stated that the first action had been brought pursuant to a notice to vacate under the statutes which govern unlawful detainer proceedings that occur as a result of a nonjudicial foreclosure; in such instances, there is no landlord-tenant relationship and therefore no landlord-tenant issues can be litigated. Endres further explained that the Bank's waiver of damages was a conditional one—the Bank had agreed to waive damages only if the court awarded to it possession of the property, which it did not. Further, the damages sought related to those arising from a hold-over tenancy, as contrasted with the current demand for past rent that arose out of the preexisting lease.

On February 29, the Ramoses sent Endres a check for $1,600 and a handwritten note indicating the check was for payment of the March 2010 rent. On March 2, Endres returned the check to the Ramoses and included a letter stating that Endres would not

accept March rent until the three-day notice was cured and past due rent of $6,400 was paid.

Endres thereafter filed a second unlawful detainer action on behalf of the Bank, seeking termination of the lease, past due rent in the amount of $6,400, and damages. Trujillo, on behalf of the Ramoses, filed a demurrer to the action, arguing that the Bank was aware of the PTFA defense prior to the first unlawful detainer trial, and therefore "could have addressed any unpaid rent at the time of trial." The Ramoses characterized the original complaint as seeking "possession and reasonable rent" from October 2009 to the date of trial; therefore, they argued, "[t]he issues of rent, possession and the PTFA were put squarely before the court at the first trial," and the second unlawful detainer seeking possession due to nonpayment of past due rent was barred.

The court rejected the Ramoses' argument. Citing authority which precludes recovery of rent unless the unlawful detainer is based on default in the payment of rent, the court concluded that the Bank "was unable to seek rent in the first action as the action was not based upon a failure to pay rent." The second action, therefore, was not barred by res judicata.

On April 29, the Ramoses filed their answer to the complaint. In it, they claimed, for the first time, that no rent was due because, pursuant to the Note and lease, rent had been prepaid for 66 months and therefore had been paid through January 2010. The Ramoses alleged: "[The Bank] is retaliating against [the Ramoses] for exercising its [*sic*] right. It [*sic*] offered to pay rent and this was declined." The Ramoses further alleged that the fair rental value of the premises alleged in the complaint was excessive because "[t]he rate wasn't estimated until the court issued a ruling. The court didn't make a retroactive order."

Endres considered the Ramoses' claim of prepaid rent and concluded there were these factual inconsistencies: (1) the Note made no reference to the prepayment of rent;[3] (2) 66 months of rent at $1,600 per month equals $105,600, but the loan to Tabernero, including interest was for $67,648.12; (3) the Ramoses tendered rent to Endres for February and March 2010, which would have been included in the prepayment under the "supposed terms of the promissory note"; (4) at no time prior to the filing of their answer to the second unlawful detainer complaint did the Ramoses mention prepayment of rent; (5) in their demurrer the Ramoses made no mention of the prepayment of rent and in fact "made a distinction between the 'promissory note' and the duty to pay rent."[4]

The court held a trial management conference on June 24. According to Endres, by that date the firm had "not yet completed [its] investigation of the Ramoses['] claim of prepayment, which included the retention of any experts to authenticate the note and subpoenaing the necessary witnesses for deposition/trial testimony." Endres, however, had conducted no discovery prior to the June 24 conference. Endres requested that the trial be continued and that discovery be reopened "regarding the validity and substance of that note."

---

[3] This was plainly inaccurate. The promissory note states "This Note will be repaid in equal monthly payments of $1,600 per month (in lieu of legal tender) as a Pre-Paid Lease Agreement by and between Eric Tabernero and Anthony and Isabelle Ramos." (Boldface and underlining omitted.) It is possible that Endres meant to say that the 2008 lease agreement did not mention prepayment of rent. However, the error is repeated in Endres's brief on appeal.

[4] This is accurate. In the "Factual Background" (underlining omitted) section of the memorandum in support of the demurrer, the Ramoses stated that they had purchased the property in 2002, had sold it to Tabernero in 2006, and from the sales proceeds had lent Tabernero $67,000. The Ramoses then explained: "The parties executed a promissory note evidencing the transaction and agreed that Mr. Tab[er]nero would make monthly payments of $1,600 per month to the [Ramoses]. The parties further agreed that the monthly payments would be applied as monthly rent *pursuant to the 2006 lease* between the parties. [¶] In October 2008, the parties renewed the lease as was required under the 2006 lease for another two years until October 2010 (hereinafter '2008 lease')." (Italics added.) As we have noted, the 2008 lease does *not* refer to prepayment of rent. The Ramoses did not contend in their demurrer that rent was prepaid for the period in dispute.

7

The Ramoses' attorney opposed the motion, arguing that the promissory note had been introduced into evidence during the first trial so the Bank had been aware of it since January 26, that the prepayment of rent was raised in the Ramoses' answer, which was filed at the end of April, and therefore that the Bank had had "plenty of time" and a continuance would be prejudicial to the Ramoses. The Bank responded by pointing out that, whatever the purpose was for introducing the promissory note into evidence at the first trial, it was clear that the court had "left open the question of whether rent was due." The judge then asked whether there had already been a finding that the lease was "bona fide." Specifically, the court stated: "Hasn't this issue about a bona fide lease or tenancy already been adjudicated? I am not saying that the amount of rent is still not an open issue. But what I am saying is that the bona fide nature of the transaction, given the fact that both the lease and the promissory note were in evidence at the last hearing, establish that the transaction was bona fide, and what the issue is, is how much rent was paid to the former landlord." The Bank's lawyer responded, "Right. [¶] . . . [¶] I am not disputing that." The attorney explained that the issue to be litigated was whether all the rent had been paid in advance, or whether the promissory note showed only that there was a loan that would be paid down in lieu of rent.

The court denied Endres's motion for a continuance. Because Endres was wary of an adverse result if the matter proceeded to trial without completing the investigation, the firm decided to dismiss the action and refile the complaint after discovery was completed.

The Ramoses then filed a motion for attorney fees based upon an attorney fee clause in the Tabernero-Ramos lease. The court denied the motion on the ground that there was no contract between the Bank and the Ramoses that provided for attorney fees; rather the PTFA provides only that the immediate successor in interest on a foreclosed property take the property subject to the rights of the tenant to occupy the premises for the remaining term of the lease. The court denied the motion on the alternative ground that there was no prevailing party, because the action had been voluntarily dismissed.

Even before the court issued its ruling on the attorney fees motion, the Ramoses filed the instant action for damages and injunctive relief against the Bank and Endres. In

8

the "common allegations" (underlining and capital lettering omitted) section of the complaint, the Ramoses alleged the history of their tenancy and the facts relating to the foreclosure and the filing of the first unlawful detainer action. They further alleged: "[After] trial in the First Action, the court found that [the Ramoses] had in fact entered into a lease and that the lease was the result of a legitimate arms length transaction and thus [the Ramoses] were entitled to the protections of [the PTFA] and ordered the bank to honor the applicable lease. [¶] In disregard of the court's order, defendant [Bank] represented by [Endres] filed a second unlawful detainer action…seeking possession of the subject property for non-payment of rent for the months leading up to the trial in the First Action. However, as proven at trial in the First Action, the applicable lease was legitimate and rent had been pre-paid for the life of the lease. [¶] . . . [¶] At the Trial Management Conference in the Second Action, the court reminded [the Bank and Endres] that the court in the First Action already deemed the lease legitimate and any challenge thereto was collaterally estopped. The [Bank and Endres] then dismissed the Second Action in open court."

On information and belief, the Ramoses alleged that the Bank and Endres "have engaged in a pattern and practice of filing malicious actions against tenants in knowing violation of tenant's right"; that the Bank "has engaged in this behavior to wrongfully gain possession of properties acquired after foreclosure in order to sell the properties quickly on the open market and to avoid fulfilling landlord responsibilities"; and that Endres "aided and abetted the bank's efforts in order to generate substantial attorney fees."

The Ramoses pleaded two causes of action—malicious prosecution and unfair business practices. The Ramoses alleged that "no reasonable person" in the Bank's circumstances and "no reasonable attorney" in Endres's circumstances would have believed there were reasonable grounds to bring the second unlawful detainer action against the Ramoses, "in light of the ruling on the First Action" and that both defendants acted with malice, fraud, and oppression.

9

The Bank and Endres each filed a special motion to strike the complaint, pursuant to Code of Civ. Proc. § 425.16.  The Bank described its motion as requesting "an order striking [the Ramoses'] . . . Malicious Prosecution Complaint," but the motion itself was silent with respect to the unfair business practices cause of action.

The Ramoses filed oppositions to each motion, which we need not describe at this point except to note that, in support of the allegations of malice and of unfair business practices, the Ramoses proffered the expert opinion of an attorney in the Housing Practice of the East Bay Community Law Center.  He averred that he had represented "several tenants" in foreclosure-related evictions against Endres, and that, in his experience, the Endres firm prosecutes cases without regard to—or in only superficial compliance with—the local Oakland eviction control ordinance and engages in a number of other bad faith actions to the detriment of the tenants.  The attorney stated that, based upon his experience and in his opinion, he "believe[s] the firm engages in unfair competition practices by filing eviction cases with no legal or factual basis and by proceeding in the use of bad faith and bad faith practices for the purpose of obtaining eviction in situations where eviction is not legally justified."

The Bank and Endres filed memoranda in reply, and Endres filed objections to the attorney-expert's declaration.  After a hearing, the court granted both motions.  The court concluded that the Ramoses had failed to produce evidence that would establish, prima facie, either the "probable cause" element or the "malice" element of their malicious prosecution cause of action.  The court also specifically ruled that the housing attorney's declaration lacked foundation and described practices that "have nothing to do with the issues involved in our case."  The court granted the motions, striking the action in its entirety.

The Ramoses filed this appeal.

ANALYSIS

A. Standard of Review

Code of Civil Procedure section 425.16 is commonly referred to as the anti-SLAPP law.[5]  It provides, in relevant part, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)

Under the statute, the court makes a two-step determination:  "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.  (§ 425.16, subd. (b)(1).) . . . If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim.  (§ 425.16, subd. (b)(1) . . . .)"  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

The standard of review on appeal from an order granting a special motion to strike under section 425.16 is de novo.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

Here, the Ramoses do not challenge the trial court's conclusion that the causes of action arose from protected activity.  What is disputed is "whether [the Ramoses] have demonstrated a probability of prevailing on the claim."  (*Navellier, supra*, 29 Cal.4th at p. 88.)

" 'In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must " 'state[] and

---

[5] "SLAPP is the acronym for 'strategic lawsuit against public participation,' first coined by two University of Denver professors.  (See Comment, *Strategic Lawsuits Against Public Participation:  An Analysis of the Solutions* (1990-1991) 27 Cal. Western L.Rev. 399.)"  (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1122, fn. 1.)

substantiate[] a legally sufficient claim.' " [Citations.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submission of both the plaintiff and the defendant ([Code Civ. Proc.] § 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citations.]" (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1235, italics omitted.)

B. Plaintiffs' Burden of Proof in a Malicious Prosecution Action

In order to determine whether the Ramoses have demonstrated a probability of prevailing in this action, we apply settled law and principles governing a malicious prosecution claim.

A plaintiff in a malicious prosecution action "must establish that the prior underlying action (1) was commenced by or at the direction of the defendant . . . and . . . was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice." (*HMS Capital, Inc. v. Lawyers Title Co*. (2004) 118 Cal.App.4th 204, 213.) "[C]ourts have long recognized that the tort has the potential to impose an undue 'chilling effect' on the ordinary citizen's willingness to . . . bring a civil dispute to court, and, as a consequence, the tort has traditionally been regarded as a disfavored cause of action." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872 (*Sheldon Appel*).) The existence or absence of probable cause to bring the challenged claim presents a question of law: "[T]he probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable." (*Id.* at p. 878.)

12

Probable cause to initiate or to prosecute a lawsuit is viewed leniently by the courts. The lawsuit need only be "legally tenable." (*Sheldon Appel, supra*, 47 Cal.3d at p. 878.) "Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit." (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 970.)

A finding of probable cause ends the matter. "If the court determines that there was probable cause to institute the prior action, the malicious prosecution action fails, whether or not there is evidence that the prior suit was maliciously motivated." (*Sheldon Appel, supra*, 47 Cal.3d at p. 875.)

C. Discussion

    1. *The Malicious Prosecution Cause of Action*

Anticipating the Bank's and Endres's contention that their voluntary dismissal of the unlawful detainer action did not satisfy the first element of a malicious prosecution action—a legal termination in their favor—the Ramoses' opening argument seeks to demonstrate that the dismissal did constitute such a favorable termination. We need not decide this question, however, because we conclude that the Ramoses have not established they can prevail on the second element, the lack of probable cause.[6]

The Ramoses' contention that the second unlawful detainer action constituted malicious prosecution is premised on the following assertions: the Ramoses prevailed in the first action, in which they were found to be protected by the PTFA. The PTFA mandates that the successor-owner assumes "such interest [in the property] subject to . . . the rights of any bona fide tenant"; thus, if the former landlord could not evict the Ramoses for nonpayment of rent, the Bank also cannot. "[A]ny reasonable attorney

---

[6] The Bank and Endres filed motions to strike from appellants' reply brief "all arguments based on the trial court's tentative ruling." They contend these arguments are improper because they were raised for the first time in the reply brief. Because we must, in any event, disregard arguments seeking to impeach the judgment based on a trial court's *tentative* ruling (see, e.g., *FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1284), the motions are denied as moot.

would have reviewed the evidence presented at the first trial to determine for what months rent was collectable. Here, the evidence at the first trial established that the tenants had lent money to their former landlord and in returned [*sic*] obtained a pre-paid tenancy and no rent was due. . . . [¶] The first trial also established the tenancy was bona fide. [¶] Taking those facts together, no reasonable attorney would have issued a 3-day notice for [rent due for] the months leading up to the first trial. . . . Defendants undisputedly had not a single iota of evidence before or after [they] filed the second unlawful detainer action tending to prove that any money was due under [the Ramoses']' lease."

If this were a correct and complete description of this case, the Ramoses' argument might have merit. Instead, it is a one-sided, inaccurate, and incomplete statement of the pertinent facts. First and foremost, the Ramoses' assertion that the evidence at the first trial "established" that the Ramoses had lent money to their former landlord and in return obtained a prepaid tenancy such that no rent was due, is, at best, an exaggeration and at worst a misrepresentation. While it is true that the Note—reflecting an agreement that a loan would be repaid by rental forgiveness of $1,600 per month—was introduced into evidence at the first trial, the terms of the Note were not addressed in the court's ruling. Insofar as the record shows, the amount of rent actually prepaid, if any, was neither litigated nor "established" in the first trial. It was only the bona fides of the Ramoses' tenancy, pursuant to the PTFA and the October 2008 lease, that were adjudicated. As was pointed out by the judge during the trial management conference for the second action, the amount of rent due was still an "open issue."

The Ramoses' argument also ignores other facts which bear directly on the issue of whether the Bank and Endres had probable cause to file the second unlawful detainer action for nonpayment of rent. For example, the fact that the Ramoses did not raise the issue of prepayment of rent during the first action—even though they introduced into evidence the Note with the prepaid lease provision—suggests that the Ramoses themselves were uncertain about either the validity or the legal effect of the Note. Consistent with that uncertainty, the 2008 lease, upon which the court relied in finding a

14

legal tenancy, did not mention the prepayment of rent, in contrast to the 2006 lease. Additionally, the court ordered the Ramoses to "pay rent" to the Bank, yet the Ramoses did not appeal that judgment, and, in fact, tendered rent. It is therefore disingenuous for the Ramoses now to contend that the evidence in the first trial "established" that "no rent was due." Finally, as was pointed out during the trial management conference, the loan to the prior landlord was for $67,648.12 (including interest), while the loan repayment terms were for 66 months of prepaid rent at $1,600 per month totaling $105,600, an unexplained discrepancy.

Given all of these facts we agree with the trial court's cogent analysis of the probable cause element: "While plaintiffs have produced a written lease agreement in which they claim to have prepaid rent, plaintiffs also twice [proffered rent to the Bank], for February 2010 and then for March 2010, both of which were periods of time in which the written lease claims rent was prepaid. In addition [the judgment] in the first action . . . directed plaintiffs to pay monthly rent to [the Bank] in a manner which implied the rental obligation may have applied from the time [the Bank] acquired the subject property in September 2009 . . . and further implying a finding that the rent was not in fact prepaid (at the least the judgment did not resolve in plaintiffs' favor the issue of prepayment of rent). Therefore, the second action . . . seeking eviction for and/or payment of back rent from October 2009 through February 2010, was brought with some probable cause and certainly would not be one in which all reasonable attorneys would agree is totally and completely without merit."

Because the Ramoses have not demonstrated they can make even a prima facie showing that there was no probable cause for the filing of the second unlawful detainer action, the issue of whether the action was brought with malice is moot. (*Sheldon Appel, supra*, 47 Cal.3d at p. 875.)

2. *The Unfair Business Practices Cause of Action Against Endres*

The trial court did not separately state its rationale for granting Endres's motion to strike the unfair business practices cause of action. Presumably the court relied on one or both of the grounds asserted in Endres's motion, which were, (1) the claim is barred by

the litigation privilege, and (2) the Ramoses cannot prove that the filing of the second unlawful detainer action constituted an unfair business practice. We agree that the cause of action is barred by the litigation privilege.

Communications made in a judicial proceeding by the litigants or their counsel that have some connection to the action or which are made to achieve the objectives of the litigation, are absolutely privileged. (Civil Code §47 (b); *Adams v. Superior Court* (1992) 2 Cal.App.4th 521, 529.) Endres contends that all of its communications were made in connection with a judicial proceeding on behalf of its client, the Bank, to vindicate the Bank's rights under the unlawful detainer statutes, and, accordingly, its actions were privileged. The Ramoses, however, contend the privilege does not apply when the plaintiff is suing only as a member of the public, citing *American Products Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP* (2005) 134 Cal.App.4th 1332 (*APC, Inc.*). They argue that they brought their claim "not as parties to underlying frivolous actions, but as members of the public who have been injured by defendants' pattern and practice of trampling tenant rights."

*APC, Inc.,* however, is inapposite. The general rule, as explained in *APC, Inc.*, is that "the litigation privilege will extend to an unfair competition claim against an attorney where the claim is founded on the attorney's misconduct in earlier litigation against the plaintiff. . . ." (134 Cal.App.4th at p. 1346.) That rule, however, does not apply where the plaintiff was not a party to the earlier litigation. The court held that because the plaintiff "[had not been] a party *to any of the litigation that underlies its unfair competition claim . . .* [it thus] appears [that the plaintiff] is simply a member of the public for purposes of the [unfair business practices] cause of action, which therefore is not foreclosed by the litigation privilege." (*Ibid.*, italics added.)

Here, in contrast, the Ramoses *were* parties to litigation that underlies their unfair business practices cause of action. In support of that cause of action, the Ramoses alleged that the Bank and Endres "have engaged in a pattern and practice of filing unfounded and malicious unlawful detainer actions with intentional disregard of tenant rights, including the right to enjoy the protections of the [PTFA]"; that "the pattern and

practice offends established public policy against malicious prosecution"; and that the Ramoses "have been injured by said practice . . . and therefore have standing to bring this action pursuant to [Bus. & Prof. Code, § 17204]."

Based upon these allegations, we reach the ineluctable conclusion that the Ramoses were parties to litigation that underlies their unfair competition claim and therefore are not "simply [] member[s] of the public for purposes of the [unfair business practices] cause of action." (*APC, Inc., supra,* 134 Cal.App.4th at p. 1346.) Consequently, the trial court properly dismissed the unfair business practices cause of action against Endres.

3. *The Unfair Business Practices Cause of Action Against the Bank*

The Ramoses contend that the trial court erred in dismissing the unfair business practices claim against the Bank because the Bank did not file a special motion to strike with respect to the unfair business practices cause of action. We agree.

Although the Bank's notice of motion stated that it was moving to strike the "Malicious Prosecution *Complaint*" (italics added), nothing in its moving or reply papers even hinted at a challenge to the unfair business practices cause of action. Further, it is apparent the Ramoses relied upon the content of the Bank's papers because their opposition to the Bank's motion contained no mention of the unfair business practices cause of action while their opposition to Endres's motion to strike did contain argument supporting their unfair business practices cause of action. The court therefore did not have before it any motion to strike the unfair business practices cause of action brought by the Bank.

The Bank argues it was sufficient to describe the motion as one to strike the "Malicious Prosecution Complaint" while conceding that it "did not offer any specific argument as to [the Ramoses'] unfair business practices claim." The Bank cites no authority for the proposition that referring to a "complaint" in a notice of motion is sufficient to put the opposing party on notice that it is challenging a cause of action about which it says nothing whatsoever in the motion itself. The Bank does rely on *Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854 for the proposition that where "the

17

plaintiff had addressed [an] issue in his opposition, plaintiff had sufficient notice" and an opportunity to respond to that issue even though it was not raised by the defendant in its moving papers. The problem with this argument is that, unlike the plaintiff in *Bacon*, the Ramoses did not address the issue in their opposition to *the Bank's* motion.

The Bank also argues the merits of the issue, and contends the Ramoses' unfair business practices claim fails "as a matter of law" on the same grounds as those proffered in support of Endres's motion to strike, and also because the Ramoses' "Opening Brief and Complaint contain no specific allegations or evidence of unfair business practices by [the Bank]." The Bank appears to contend that despite the trial court's plain error in granting a motion that was never brought or argued, it is the Ramoses' burden on appeal to demonstrate they were "denied the ability to assert <u>any</u> additional arguments before the trial court in relation to their claim of unfair business practices as to [the Bank]." (Underlining original.) That is not the law. In *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, the respondent made a similar argument. There, the trial court mistakenly dismissed the plaintiff's entire action although the defendant had moved to strike only one cause of action. The trial court later corrected the dismissal order and judgment, striking only the challenged cause of action. On appeal the defendant essentially argued that the trial court's dismissal of the entire action should nevertheless be upheld because the issues raised in the challenged cause of action were inextricably intertwined with the remaining causes of action, so "it should make no difference which causes of action were dismissed, . . . they were all invalid anyway." (*Id.* at p. 48.) The court rejected that argument, noting that "there was never any entitlement to a final order dismissing the entire action, because the District's motion to strike was expressly directed at only the fifth cause of action, and nothing more was ever noticed to the parties or brought before the trial court." (*Ibid.*)

Whether or not the Ramoses' unfair business practices cause of action against the Bank is sustainable, fundamental due process entitles them to notice and an opportunity to be heard prior to adjudication. (*Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199, 207 ["A basic rule of law and motion practice is the notice of motion 'shall state in

18

the opening paragraph the nature of the order being sought and the grounds for issuance of the order.' "].)

### III.
### DISPOSITION

The order and judgment granting Endres's motion to strike the complaint is affirmed. The order granting the Bank's motion to strike the malicious prosecution cause of action is affirmed. The order striking the unfair business practices cause of action against the Bank is reversed, and the matter is remanded for proceedings consistent with this opinion. Endres shall recover its costs on appeal. The Ramoses and the Bank shall bear their own costs.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

19